# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

BRANDON STEVEN MOTORS, LLC,  )
                             )
        **Plaintiff,**        )
                             )
**v.**                         )     **Case No.  2:19-CV-02659-JAR-GEB**
                             )
**LANDMARK AMERICAN**   )
**INSURANCE COMPANY,**    )
                             )
        **Defendant.**     )

## BSM'S RENEWED MOTION FOR SUMMARY JUDGMENT

Over two years ago, in the late evening of May 5, 2019, the City of Wichita experienced a severe hailstorm. [SOF, ¶ 6]. The hailstorm damaged hundreds of vehicles in Plaintiff Brandon Steven Motors' ("BSM") open lot car dealership. [*Id.*]. Every eyewitness has testified that they saw significant storm damage to these vehicles. [*Id.*, ¶¶ 7-8]. BSM immediately reported the claim to its insurance carrier, Defendant Landmark American Insurance Company ("Landmark"). [*Id.*, ¶¶ 9-10]. Landmark retained Expert Auto Claims ("Expert Auto") as its adjuster, to inspect the damaged vehicles and provide a claim valuation. [*Id.*, ¶¶ 12, 14]. On May 7, 2019, Expert Auto sent 3 independent inspectors to personally review the damages. [*Id.*, ¶ 11]. The inspectors spent 10 days on BSM's lot, looked at every damaged vehicle, and testified that all the damage to BSM's vehicles was caused by the hailstorm. [*Id.*, ¶¶ 15-16, 143-148]. Based on the inspectors' observations, on June 24, 2019, Landmark's adjuster (Expert Auto) evaluated the insurance claim at $2,300,949.19, which was "Total After Deductible" and after applying any policy requirements. [*Id.*, ¶¶ 19-23]. BSM agreed with this evaluation. [*Id.*, ¶ 24]. This should have resulted in payment.

Indeed, a fifty-state search has not shown any case where the policyholder agreed with the insurance carrier's claim adjustment, and yet the insurance carrier refused to pay. Rather, even where the policyholder disputes the adjusted amounts, at a minimum the insurance carrier still pays its undisputed adjusted amount. *See, e.g., Steven Volkswagen, Inc. v. Zurich American Ins. Co.*, 2019 WL 6310186, *1 (D. Kans. Nov. 25, 2019) (recognizing that the insurance carrier paid its adjuster's estimate on storm damage to the car dealership's vehicles, but policyholder then contested that amount); *Ellis Motor Cars, Inc. v. Westport Ins. Corp.*, 2007 WL 1991573, *2 (M.D. Ala. July 5, 2007) (recognizing that the insurance carrier paid its adjusted amount for storm damage to a dealership's vehicles, but that the policyholder disputed the adjusted amount); *Certain Underwriters at Lloyd's London v. Pete's Car Smart, Inc.*, 2005 WL 8158546, *1 (N.D. Tex. Dec. 2, 2005) (Dispute over storm damage to dealership's vehicles only arose because the policyholder disagreed with the amount adjusted by the insurance carrier).

Yet, for well over two years now Landmark has refused to pay on its adjusted loss, leaving BSM without payment for this devastating loss during all this time.[1] [SOF, ¶ 28, 110]. Given that BSM paid nearly $1.5 million in premium for its Dealers Open Lot insurance policy, No. LHT905483 ("Open Lot Policy") (*see* SOF, ¶¶ 2-3), Landmark's dilatory behavior is unconscionable. *See, e.g., Bjornestad v. Progressive Northern Ins. Co.*, 664 F.3d 1195, 1199-1200 (8th Cir. 2011) (finding that insurance carrier's offer of payment for less than its own estimate was vexatious or without reasonable basis). The Open Lot

---

[1] For perspective, BSM's loss took place more than ten months before the U.S. first declared a national emergency for COVID-19.

79557338.1

Policy limit here is $2,500,000.00 and provides comprehensive coverage for "'loss' caused by or resulting from damage to a covered 'automobile' from ***any*** external cause." [SOF, ¶¶ 3, 119, 121 (emphasis added)].

Instead of paying on the claim, Landmark has engaged in delays to avoid payment for as long as possible. BSM should have been paid on its claim after Landmark adjusted the loss through Expert Auto. Even Landmark recognized this, asking over two years ago, on June 26, 2019, if BSM is "in agreement" with Expert Auto's calculations, to which BSM responded "[y]es sir, the numbers are acceptable." [SOF, ¶¶ 25-26].  At that time, Landmark stated that it only needed "one more item from Expert Auto that they said I should have by Friday," and could then pay on BSM's claim. [*Id.*, ¶ 25]. Landmark later confirmed that the "one more item" it was waiting for was "a split between the wind and the hail damage," even though the policy does not differentiate between payment on wind and hail damage. [*Id.*, ¶¶ 32-35]. Despite receiving that "one more item" two years ago, Landmark has never paid anything on BSM's claim. [*Id.*, ¶ 110]. That "one more item" did not include any of the discovery the parties engaged in pursuant to Landmark's 56(d) request. [*See* Doc. 37 at 3]. Landmark's adjustment of BSM's loss on June 24, 2019, and the parties' agreement to that adjustment is dispositive of BSM's recovery here. Landmark's behavior constitutes bad faith as a matter of law.

Even Landmark's corporate representative admits: "I don't think we are saying they weren't damaged by the covered loss, we are just saying we don't have a completed investigation." [SOF, ¶ 136]. That investigation arose because one Expert Auto employee thought some of the wind damages to the vehicles looked suspicious. [*Id.*, ¶¶ 42-56]. Yet Landmark waited an entire month before initiating its investigation on June 7, 2017. [*Id.*,

¶ 56]. Landmark intentionally kept the investigation minimal, which fully concluded on June 17, 2017. [*Id.*, ¶¶ 57-68, 73, 75-77]. Landmark directed its investigator to conduct only a "limited investigation" that consisted of just 4.1 hours total, including the time taken to draft the report, at a total cost of approximately $1,300. [*Id.*, ¶¶ 57, 73]. Landmark instructed the investigator not to interview any firsthand witnesses, including anyone onsite from BSM, the repair company (USA Dent), or even the three inspectors sent by Landmark's adjuster. [*Id.*, ¶¶ 60, 64, 67-68, 73, 76]. Landmark's investigator suggested additional follow-up steps to take, but Landmark rejected them all. [*Id.*, ¶¶ 63-68]. Had Landmark done so it would have known that every single witness confirmed that the vehicles were heavily damaged, that the damage was caused by the storm, and that the vehicles were all repaired by USA Dent. [*Id.*, ¶¶ 7-8, 81-83, 143-148].

BSM originally filed its motion for summary judgment over one year ago, on April 27, 2020 (Doc. 29), to finally get paid on its claim and avoid unnecessary attorney fees. Landmark blocked that effort, and responded by filing a motion for additional time under Rule 56(d), stating that "additional discovery would permit Landmark to develop facts about: (1) whether the vehicles at issue in the claim were damaged by the May 5, 2019 storm, (2) whether the damage to the vehicles at issue were man-made, (3) whether plaintiff and/or its representatives treated these vehicles as damaged, particularly at the time of sale, and (4) whether the vehicles at issue were ever repaired." [Doc. 37 at 3]. Multiple hearings, dozens of depositions, and hundreds of attorney hours later, the evidence universally rebuts Landmark's position on each of these four categories as follows:

(1) Every single firsthand witness testified that the vehicles were damaged by the May 5, 2019 storm. [SOF, ¶¶ 6-8, 133, 141-148]. Landmark could have known this over

two years ago, but instead chose not to interview any firsthand witness. [*Id.*, ¶¶ 64, 67-68, 74, 76].

(2) BSM has now learned that two years ago Landmark affirmatively instructed G4S **_not_** to investigate whether the damage to the vehicles at issue were man-made. [*Id.*, ¶¶ 58-59]. It is the epitome of bad faith for an insurance carrier to affirmatively avoid investigating during the claims process, and then delay summary judgment during litigation based on discovery that they specifically and intentionally avoided. Regardless, discovery has clearly shown that the damages were not man-made. All three independent inspectors sent by Expert Auto (Landmark's adjuster) testified that the vehicle damage was all caused by the storm and was not man-made. [*Id.*, ¶¶ 53, 143-148]. Three other witnesses testified that they observed hail and wind damage to the vehicles all caused by the storm. [*Id.*, ¶¶ 133, 148]. The only witness to give a different opinion was James Clark, who was on site for just two days. [*Id.*, ¶¶ 42-44]. He thought some of the wind damage looked suspicious and believed that the wind damage on 5-6 vehicles was man-made. [*Id.*, ¶¶ 44-46]. He could not speak to the other hundreds of vehicles, however, and admitted that he does not have any basis to point to BSM as the source of what he considered suspicious damages. [*Id.*, ¶¶ 51-52]. Mr. Clark based his opinion on the erroneous assumption that the storm only brought straight-line wind. [*Id.*, ¶¶ 44-45, 77, 134]. Mr. Clark did not take any pictures, did not speak inform BSM about his concerns, did nothing to stop repairs of the vehicles, and did not do anything to otherwise document and preserve this allegedly suspicious damage. [*Id.*, ¶ 50].

(3)(4) These categories have no relevance to the policy. Regardless, every witness testified to the same thing: the vehicles were all repaired prior to sale. [SOF, ¶¶ 81-83].

Only a handful of vehicles were not repaired prior to sale, but in each case were brought back for repairs. [*Id.*, ¶ 82]. Accordingly, every vehicle damaged by the May 5, 2019 storm was repaired. [*Id.*, ¶¶ 81-83]. USA Dent had tents up on BSM's lot and spent 2-3 months working every day to get the vehicles repaired, but to date has not been paid because of Landmark's refusal. [*Id.*, ¶¶ 28, 81]. Given the uniformity of every witness's testimony, it is incredible that Landmark (through its counsel) stated over one year after the loss: "I think we need to get to the elephant in the room which is were repairs really done?" [8/12/2020 Hearing at 33:2-4, attached hereto as Exhibit 50]. All Landmark had to do during the claims process was ask **anyone** who was at BSM's car lot, as every single witness has testified that USA Dent expended enormous time and effort to repair the vehicles. [SOF, ¶¶ 81-83].

There is simply no reason to continue leaving BSM unpaid. As shown below: (1) there is no question that the hundreds of BSM vehicles were damaged by "any external cause," as required for coverage; (2) Landmark cannot sustain its burden to exclude coverage because it cannot present a single witness to say that BSM manufactured any of the damage; and (3) the parties previously agreed upon a valuation of $2,300,949.19. BSM is entitled to summary judgment in this amount, in addition to interest and attorneys' fees.

## STATEMENT OF UNCONTROVERTED MATERIAL FACTS

1.      BSM owns various car dealerships in and around Wichita, Kansas that at any given time have hundreds of vehicles for sale on their open lots. [Declaration of Tim Bishop ("Bishop Decl.), attached hereto as Exhibit 1, at ¶ 2].

2.      Given the large risk from having so many vehicles in open lots, BSM purchased from Landmark an insurance policy specifically meant to cover the risk from hailstorms – a Dealers Open Lot Coverage Policy, No. LHT905483 ("Policy"), with a

6

policy period of August 31, 2018 to August 31, 2019. [*Id.*, Ex. 1 hereto at ¶ 3; Doc. 27-1 at p. 3 of 41, under "Common Policy Declarations"].

3.      BSM paid nearly $1.5 million in premium and broker fees to purchase the Policy, which has limits of $2.5 million. [Doc. 27-1 at p. 3 of 41, under "Common Policy Declarations;" Deposition of Brian Snead (1/21/21) ("Snead Depo."), attached hereto as Exhibit 2, at 30:11-18].

4.      In underwriting this Policy, Landmark knew that the "likelihood of a storm causing damage" was "[m]ore likely here than in many other places" and was a "significant risk." [Snead Depo., Ex. 2 hereto at 37:5-38:17].

5.      The risk is so high that Landmark has seen a class-wide increase in wind damage for car dealerships like BSM, and has accordingly reduced the number of these policies that they write, as well as the limits of coverage available. [Snead Depo., Ex. 2 hereto at 69:18-71:8].

## MAY 5, 2019 STORM AND LANDMARK'S APPRAISERS

6.      On the evening of May 5, 2019, a significant storm hit a BSM car dealership in Wichita, causing damage to hundreds of vehicles on the premises. [Bishop Decl., Ex. 1 hereto at ¶ 4; 5/6/19 11:21 a.m. Email from T. Bishop to D. Durbin, attached hereto as Exhibit 3; 5/6/19 2:51 p.m. Email from T. Bishop to D. Durbin, attached hereto as Exhibit 4; Deposition of Matthew Rhead (3/24/21) ("Rhead Depo."), attached hereto as Exhibit 5, at 23:2-24:13; Deposition of Donna Foster (4/7/21) ("D. Foster Depo."), attached hereto as Exhibit 6, at 46:18-47:2; Expert Auto Report, attached hereto as Exhibit 7, under "Cause of Loss"].

7.      Every single witness in this case that visited the BSM dealership has testified that this extensive storm severely damaged hundreds of BSM's vehicles. [Deposition of Tim Bishop (2/11/21) ("Bishop Depo."), attached hereto as Exhibit 8, at 27:11-15 ("it was evident to the naked eye that there was damage on the vehicles"); Deposition of Terry Sandifar (2/10/21) ("Sandifar Depo."), attached hereto as Exhibit 9, at 14:4-6; Deposition of Regan Hunt (5/18/21) ("Hunt Depo."), attached hereto as Exhibit 10, at 26:2-12, 43:25-44:6 (stating that "everybody was aware"); Deposition of Anthony Cope (6/3/21) ("Cope Depo."), attached hereto as Exhibit 11, at 45:8-12; Deposition of Brandon Steven (7/1/21) ("Steven Depo."), attached hereto as Exhibit 12, at 27:5-27:23, 28:18-29:2; 32:2-17; Deposition of Jonathan Graham (2/10/21) ("Graham Depo."), attached hereto as Exhibit 13, at 41:3-20; Deposition of Derek Pruitt (4/16/21) ("Pruitt Depo."), attached hereto as Exhibit 14, at 18:20-25; Deposition of Dennis Sanders (6/3/21) ("Sanders Depo. II"), attached hereto as Exhibit 15, at 193:1-197:3, 272:5-19].

8.      Some witnesses also testified that their own personal vehicles were on the lot at the time, and that they experienced both wind and hail damage to their vehicles. [Deposition of Callen Gilbertson (3/4/21) ("Gilbertson Depo."), attached hereto as Exhibit 16, at 21:8-24:19, 25:6-15; Hunt Depo., Ex. 10 hereto at 13:14-24, 14:11-18:6].

9.      BSM reported the loss to Landmark the very next day, on May 6, 2019, and provided an inventory listing of vehicles on the lot. [Bishop Decl., Ex. 1 hereto at ¶¶ 5-6; 5/6/19 Emails, Exs. 3 & 4 hereto; D. Foster Depo., Ex. 6 hereto at 36:25-37:3].

10.     BSM did not itself provide any dollar amount for the loss or any explanation of the specific cause of damage other than the hailstorm, as BSM left that analysis to Landmark and its adjusters/appraisers. [Bishop Decl., Ex. 1 hereto at ¶¶ 7-9; 5/6/19 Email,

Ex. 3 hereto at 1 (stating that "[w]e had a hail event last night around 9:00 which has affected approx. 300 New Units and 120 Used Units")].

11.     On May 7, 2019, Expert Auto Claims ("Expert Auto") sent a team of three adjusters to inspect the damaged vehicles and provide information for an appraisal of damages. [Bishop Decl., Ex. 1 hereto at ¶ 10; Examination Under Oath of Tim Bishop (9/27/19) ("Bishop EUO"), attached hereto as Exhibit 17, at 45:7-46:3 (describing how Expert Auto Claims walked the lot and prepared an estimate) and at corrections sheet (stating that "the adjusters with Expert Auto arrived as did I on the morning of the 7th")].

12.     Expert Auto was retained by Landmark to visually inspect the vehicles, see what caused the damages, determine the scope of the damages, take photos, and prepare estimates. [Deposition of Daniel Durbin (1/21/21) ("Durbin Depo."), attached hereto as Exhibit 18, at 27:25-28:11].

13.     USA Dent – a local Wichita entity that BSM retained to identify damages and perform repairs to the vehicles – inspected the vehicles alongside the Expert Auto Claims adjusters and agreed with Expert Auto Claims' estimate of loss under the Policy. [Bishop Decl., Ex. 1 hereto at ¶ 11; Deposition of Tim Bishop (2/11/21) ("Bishop Depo."), attached hereto as Exhibit 19, at 99:14-24, 104:13-21, 106:1-16; Deposition of Dennis Sanders (1/6/21) ("Sanders Depo. I"), attached hereto as Exhibit 20 at 73:14-74:8, 94:2-95:4, 98:10-99:6; Sanders Depo. II, Ex. 15 hereto at 193:1-197:3, 202:16-20, 249:24-250:4, 265:2-22].

14.     On its website Expert Auto Claims states the following:

Expert Auto Claims provides automotive appraisal services for hail, wind, and flood damaged vehicles. We specialize in appraisals utilizing Paintless Dent Repair as the method of restoration. . . . We understand that in

catastrophic situations your customers want immediate action. Upon receiving an assignment we take immediate action, following the claim through the entire appraisal process to ensure quality control.

Expert Auto Claims is the leader in providing estimates for vehicle dealer inventories. Our process takes the least amount of time possible **to allow you to cut checks to dealers so they can repair vehicles** and get their inventory back in action. **Expert Auto Claims works with [the dealer's] insurance adjuster to speed the process of getting a claim check cut for your damaged inventory**. We are experts in getting estimators onto your lot and writing up vehicles within days. ["About Us" screen from Expert Auto at www.expertautoclaims.com/about-us, attached hereto as Exhibit 21; Expert Auto homepage at www.expertautoclaims.com, attached hereto as Exhibit 22 These are the webpages as of April 24, 2020. (emphasis added)].

15.     The Expert Auto Claims adjusters retained and sent by Landmark spent several days at the premises and personally inspected the damaged vehicles. [Bishop Decl., Ex. 1 hereto at ¶ 12].

16.     Expert Auto inspected all of the damaged vehicles, other than any already sold, between May 7-17, 2019. [Durbin Depo., Ex. 18 hereto at 66:13-16, 68:13-17; Expert Auto Invoice, attached hereto as Exhibit 23; Deposition of James Clark (4/1/21) ("Clark Depo."), attached hereto as Exhibit 24, at 44:21-45:11; D. Foster Depo., Ex. 6 hereto at 38:3-13, 51:2-25].

17.     BSM provided Landmark with all requested information during Expert Auto's inspection, and was repeatedly told by Landmark that there was nothing more needed from BSM to speed up the process. [Durbin Depo., Ex. 18 hereto at 40:8-41:12, 42:1-43:1, 50:5-51:9, 51:20-52:17].

18.     Landmark's corporate representative admits that BSM was "very" responsive during the claims process. [*Id*., Ex. 18 hereto at 146:15-148:2].

19.     By June 24, 2019, Expert Auto sent to Landmark a spreadsheet with the Dollar amount of BSM's losses that should be paid by Landmark pursuant to the Policy ("Expert Auto Appraisal"). [6/25/19 Email from D. Foster with Expert Auto Appraisal, attached hereto as Exhibit 25; D. Foster Depo., Ex. 6 hereto at 11:11-20, 12:8-11, 30:13-18].

20.     Expert Auto did not do any additional work after preparing the Expert Auto Appraisal. [Durbin Depo., Ex. 18 hereto at 61:21-62:1].

21.     The Expert Auto Appraisal determined an amount of $2,300,949.19 for the loss, which was "Total After Deductible." [Bishop Decl., Ex. 1 hereto at ¶ 15; Expert Auto Appraisal, 25 hereto at final entry; Bishop Depo., Ex. 19 hereto at 106:25-107:5].

22.     The Expert Auto Appraisal included a deduction for a prior loss experienced by BSM, which Tim Bishop had communicated to Expert Auto. [Bishop Decl., Ex. 1 hereto at ¶ 16; D. Foster Depo., Ex. 6 hereto at 68:7-10].

23.     The Expert Auto Appraisal complied with Policy procedures for valuing a claim, applied Policy deductibles, and took into account any Policy discounts. [Landmark's Response to Second Requests for Admission, No. 23, attached hereto as Exhibit 26; Durbin Depo., Ex. 18 hereto at 68:18-69:17; D. Foster Depo., Ex. 6 hereto at 13:17-24, 14:3-11, 48:3-24, 50:5-16, 72:2-8, 91:24-92:5; Deposition of Rick McKay (2/28/21) ("McKay Depo."), Exhibit 27 hereto, at 62:10-63:6, 72:19-22; Deposition of Stephen Foster (4/30/21) ("S. Foster Depo."), attached hereto as Exhibit 28, at 12:21-13:4].

24.     Landmark approved the Expert Auto Appraisal, has no issue with how it was prepared, and admits that it is the measure to use for payment. [Durbin Depo., Ex. 18 hereto at 46:9-12, 46:22-47:4, 111:14-113:9].

79557338.1

25.     On June 26, 2019, Dan Durbin (the claims administrator on behalf of Landmark) asked with respect to the Expert Auto Appraisal – "Tim are you in agreement to the latest spreadsheet? I need one more item from Expert Auto that they said I should have by Friday." [6/26/19 Emails between T. Bishop and D. Durbin, attached hereto as Exhibit 29, at 1].

26.     That same day, Tim Bishop responded on behalf of BSM – "Yes sir, the numbers are acceptable. Thank you for the update, with the 4th of July holiday next week it would be nice to have this handled by then." [*Id.*; Bishop Decl., Ex. 1 hereto at ¶ 17].

27.     Landmark has not offered any other estimate or appraisal other than the Expert Auto Appraisal. [Bishop Decl., Ex. 1 hereto at ¶ 18].

28.     Because of Landmark's delay in payment, BSM paid $150,000 out of its own pocket to help pay for some of USA Dent's contractors who were fixing the vehicles, many of whom remain unpaid to this day. [Bishop Depo., Ex. 8 hereto at 110:10-19; Cope Depo., Ex. 11 hereto at 40:9-41:8; Sanders Depo. I, Ex. 20 hereto at 109:16-110:5; Sanders Depo. II, Ex. 15 hereto at 200:13-21, 229:11-230:1].

## LANDMARK'S BAD FAITH DELAY

29.     On Monday, July 1, 2019, Tim Bishop followed up with Landmark, stating – "Dan, I am following up on my email from last week. Were you able to secure the information you were needing from Expert Auto on Friday? Any chance we could get this paid before the holiday?" [7/2/19 Emails between T. Bishop and D. Durbin, attached hereto as Exhibit 30, at 2].

79557338.1

30.     The next day, on July 2nd, Dan Durbin responded that "It does not look like that will happen. I continue to work on getting everything I need processed, so my investigation continues." [*Id.*].

31.     Tim Bishop responded by asking "Are there extenuating circumstances as to why this claim is taking so long to close?" [*Id.*].

32.     Dan Durbin responded that the reason for the delay was that "we are getting a split between the wind and the hail damage. I asked Expert Auto to provide that to me." [*Id.*].

33.     Brandon Steven (Brandon Steven Motors) then responded that "Expert told us that they provided that to you a week ago." [*Id.* at 1].

34.     In response, Dan Durbin stated that "[w]hen my investigation is over, I will be able to let you know when. I have not received that from expert auto. The wind/hail split is what I need." [*Id.*].

35.     The Policy does not differentiate between payment on wind damage and payment on hail damage from a storm. [*See* Doc. 27-1 at p. 12 of 41, under "Windstorm" (defining Windstorm as "an atmospheric disturbance *marked by high winds*, with or without precipitation, *including* such events as . . . *hailstorm*" (emphasis added)].

36.     Landmark sent a reservation of rights letter on July 3, 2019, stating for the first time that "[a]ccording to Landmark's investigation to date, the sustained wind speeds at the loss location on May 5, 2019 may not have reached a velocity necessary to cause damage to vehicles." [7/3/19 Letter, attached hereto as Exhibit 31, at 5].

37.     Landmark has not provided to BSM any substantiating evidence for its assertion that wind speeds may not have reached a velocity necessary to cause damage to BSM's vehicles. [Bishop Decl., Ex. 1 hereto at ¶19].

38.     Landmark further stated, for the first time, that "Landmark also has concerns about whether BSM has misrepresented or concealed material facts from Landmark during its investigation of the claimed loss." [7/3/19 Letter, Ex. 31 hereto at 5].

39.     Landmark did not inform BSM as to what "misrepresentation or concealment" it was alleging. [*Id.*; Bishop Decl., Ex. 1 hereto at ¶ 20].

40.     Landmark's Answer to the Amended Complaint asserts misrepresentation or fraud as an affirmative defense without providing any factual basis for the legal conclusion. [Doc. 28 under "Affirmative Defenses," ¶¶ 8-9].

41.     By July 10, 2019, Landmark confirmed that it received the "spreadsheet isolating the wind damage from the hail damage." [7/9/19-7/10/19 Emails between T. Bishop and D. Durbin, attached hereto as Exhibit 32].

<u>JAMES CLARK'S SUSPICIONS</u>

42.     James Clark is an employee of Expert Auto that put together the 3-person team of John Harris, William Roberts, and Bill Matthews to inspect the BSM vehicle damages. [Clark Depo., Ex. 24 hereto at 31:16-19, 32:5-18, 34:2-35:3, 36:14-20].

43.     Mr. Clark visited the BSM dealership for two days from May 9-10, 2019. [*Id.* at 31:16-19, 36:14-20].

44.     Mr. Clark expected straight-line wind damage to the vehicles, and believed it was suspicious when he observed scratches on all sides of the vehicles. [*Id.* at 40:12-25, 42:13-18].

79557338.1

45.     Mr. Clark agreed that there could be damages to all sides of the vehicles if the wind was coming in multiple directions. [*Id.* at 40:12-25; Deposition of Harry Gianakon (2/22/21) ("Gianakon Depo."), attached hereto as Exhibit 33, at 72:1-8].

46.     During a lunch break Mr. Clark looked at 5-6 vehicles out in the open lot that looked like they did not have wind damage on their sides, but when they came through for inspection several hours later they had damage on their sides that he did not observe previously. [Clark Depo., Ex. 24 hereto at 48:15-49:15, 50:10-23].

47.     Mr. Clark then called Rick McKay at Expert Auto about how to proceed. [*Id.* at 51:14-52:7].

48.     Mr. McKay called Dan Durbin at Landmark about how to proceed and was told not to tell BSM about Mr. Clark's observations and to simply proceed with the inspection. [McKay Depo., Ex. 27 hereto at 43:7-45:14].

49.     Mr. McKay then called Mr. Clark and told him to simply proceed and document the damage as presented. [Clark Depo., Ex. 24 hereto at 52:3-7, 52:14-22].

50.     Mr. Clark did not take any photos of these 5-6 vehicles, cannot identify those vehicles today, did not see anyone around the vehicles, did not inform BSM, and did not inform anyone to halt repair work on the vehicles. [*Id.* at 49:8-15, 50:24-51:3, 52:8-53:11; Durbin Depo., Ex. 18 hereto at 29:20-30:20].

51.     Mr. Clark did not have any direct communications with BSM and did not rely in any way on representations made by BSM. [Clark Depo., Ex. 24 hereto at 61:17-62:3].

52.     Mr. Clark could not speculate as to the damages to the hundreds of other vehicles, nor did he know whether anybody at BSM was involved with what he believed was suspicious damage to 5 or 6 vehicles. [*Id.* at 75:12-21, 76:1-12].

53.     Mr. Clark's belief of suspicious damages is contradicted by the other three independent inspectors who personally inspected the BSM vehicles over the course of 10 days. [Deposition of Billy Matthews (7/2/21) ("Matthews Depo."), attached hereto as Exhibit 34, at 14:8-11, 14:18-15:11, 18:14-24, 19:4-8, 20:10-15, 20:21-21:5, 21:23-22:12, 25:12-26:1; Deposition of John Harris (7/1/21) ("Harris Depo."), attached hereto as Exhibit 35, at 14:7-11, 14:15-17, 15:4-20, 16:2-17:6; Deposition of William Roberts (6/30/21) ("Roberts Depo."), attached hereto as Exhibit 36, at 12:10-14:6, 14:15-15:2; Clark Depo., Ex. 24 hereto at 43:20-25, 56:25-57:7].

## THE G4S "INVESTIGATION"

54.     On July 18th - approximately ten weeks after Landmark first received BSM's claim – Dan Durbin had a phone call with Tim Bishop wherein Mr. Durbin stated that Landmark had retained an investigation company (G4S) to do some preliminary research on the dealership location and wind speeds. [Bishop Decl., Ex. 1 hereto at ¶ 23].

55.     Landmark had actually retained G4S over a month earlier, as G4S specializes in investigating fraud. [Durbin Depo., Ex. 18 hereto at 34:6-13].

56.     The G4S investigation was conducted from June 7, 2019 to June 17, 2019, by Harry Gianakon. [Gianakon Depo., Ex. 33 hereto at 108:10-19, 114:17-24; G4S Invoice, attached hereto as Exhibit 37].

57.     Landmark authorized a very "limited investigation" that only allowed G4S to perform specified tasks that took a total of 4.1 hours.  [Deposition of Thomas Shane

(4/27/21) ("Shane Depo."), attached hereto as Exhibit 38, at 48:23-49:4, 49:19-50:18; G4S

Invoice, Ex. 37 hereto; Gianakon Depo., Ex. 33 hereto at 91:17-20, 105:3-7].

58.    The original objectives given to G4S for the investigation were to "determine

if the damages were created or if it is legitimate wind damage; to canvas the area for other

dealers to see if they suffered any similar damage; to obtain weather reports; and to

interview Expert Auto personnel regarding their belief the damages were caused by wind

or may have been caused by wind; and to file a state fraud referral based on reasonable

suspicions." [Gianakon Depo., Ex. 33 hereto at 37:3-14, 38:21-39:13; G4S Report, attached

hereto as Exhibit 39, at Bates No. L001488, under "Investigation Objectives"].

59.    Landmark immediately canceled the objective of determining whether the

wind damage was legitimate or man-made. [Durbin Depo., Ex. 18 hereto at 73:13-19;

Shane Depo., Ex. 38 hereto at 32:4-10; Gianakon Depo., Ex. 33 hereto at 39:14-23, 41:14-

42:15; G4S Report, Ex. 39 hereto at Bates No. L001488, under "Investigation Objectives"].

60.    G4S completed its investigation and case objectives by June 17, 2019, and

Landmark did not give any additional investigation assignments. [Durbin Depo., Ex. 18

hereto at 73:4-12, 86:1-20; Shane Depo., Ex. 38 hereto at 58:6-22, 71:15-72:7; Gianakon

Depo., Ex. 33 hereto at 46:10-47:3, 104:21-105:2, 107:16-21, 109:25-110:3, 113:5-9].

61.    G4S prepared a final report from its investigation ("G4S Report"). [G4S

Report, Ex. 39 hereto].

62.    Landmark has no disagreement with the G4S Report. [Durbin Depo., Ex. 18

hereto at 71:9-11].

63.    In its Report, G4S made the following suggestions for additional

investigation: "[1] If desired, a social media search could be conducted to locate other

photographic evidence of this storm. [2] If desired, the Investigator could review claimed vehicle damages and/or speak with the Insured. [3] If desired, the Investigator could get a recorded statement from Expert Auto Claims Manager James Clark. [4] **At this stage in the investigation, a State Fraud Referral did not appear to be warranted**." [G4S Report, Ex. 39 hereto at Bates No. L001494, under "Follow-Up Investigation to be Completed" (emphasis added); Shane Depo., Ex. 38 hereto at 35:12-24].

64.     Landmark rejected the additional investigation suggested by G4S, which had concluded that no state fraud referral was warranted. [Durbin Depo., Ex. 18 hereto at 76:18-78:24, 125:1-126:9; Shane Depo., Ex. 38 hereto at 35:12-24; G4S Report, Ex. 39 hereto at Bates No. L001494; Gianakon Depo, Ex. 33 hereto at 31:17-24, 49:4-14, 90:17-91:10, 92:14-93:18, 94:13-22, 98:9-11, 99:22-100:5].

65.     G4S did not do the social media search it recommended to Landmark because Landmark made the decision not to do so. [Shane Depo., Ex. 38 hereto at 39:14-40:9].

66.     G4S did not review the vehicle damage, review photos, or speak with BSM, as it had recommended to Landmark, because Landmark made the decision not to do so. [*Id.* at 40:10-19, 61:4-16, 63:7-11; Gianakon Depo., Ex. 33 hereto at 39:14-23, 41:14-42:15, 83:14-20; Durbin Depo., Ex. 18 hereto at 35:7-21].

67.     G4S did not take a recorded statement from James Clark, as it had recommended to Landmark, because Landmark made the decision not to do so. [Shane Depo., Ex. 38 hereto at 40:20-41:8; Clark Depo., Ex. 24 hereto at 56:9-12; Gianakon Depo., Ex. 33 hereto at 46:10-47:3, 48:2-7, 80:9-17, 96:2-97:1].

68.     G4S did not speak to anyone with firsthand knowledge of BSM's loss because Landmark did not ask them to do so. [Shane Depo., Ex. 38 hereto at 42:21-43:12, 60:23-61:3].

69.     Insurance companies have an obligation to report fraud to the state when they know it exists. [Gianakon Depo., Ex. 33 hereto at 31:17-24, 35:1-4].

70.     The G4S investigator would make a fraud referral internally "if there is reasonable suspicion of fraud [and] I suspect fraud is being committed by a person or persons or organization." [*Id.* at 33:7-16].

71.     G4S concluded that a state fraud referral was not warranted because there was not a reasonable suspicion of fraud and of who committed the fraud. [Durbin Depo., Ex. 18 hereto at 134:11-19; G4S Report, Ex. 39 hereto at Bates No. L001494; Gianakon Depo., Ex. 33 hereto at 49:4-14, 92:5-13, 98:9-11].

72.     Landmark cannot dispute G4S' conclusion that the state fraud referral was not warranted. [Durbin Depo., Ex. 18 hereto at 78:21-24].

73.     G4S did everything that Landmark requested them to do, and it only took 4.1 hours at a cost of $1,340.43. [*Id.* at 49:10-20, 79:1-80:21, 130:8-131:2; Shane Depo., Ex. 38 hereto at 31:21-32:3, 73:15-74:9; G4S Invoice, Ex. 37 hereto].

74.     G4S relied wholly upon a recorded statement from Steve Foster for its report. Steve Foster did not have any first-hand knowledge of BSM's loss, and instead relied entirely upon a conversation with Rick McKay for his information. Rick McKay did not have any first-hand knowledge of BSM's loss, and instead relied entirely upon a conversation with James Clark for his information. [S. Foster Depo., Ex. 28 hereto at 10:3-20, 11:15-23, 12:10-17, 13:23-25, 14:9-15:2; G4S Report, Ex. 37 hereto; Gianakon Depo.,

19

Ex. 33 hereto at 67:21-69:1; McKay Depo., Ex. 27 hereto attached hereto at 37:15-18, 42:5-18, 61:10-17].

75.     As of June 21, 2019, Landmark's adjuster believed they should "let G4S go ahead and interview the insured and their contractor, USA Dent." Yet neither Landmark nor G4S interviewed anybody from BSM or USA Dent as part of the investigation. [Durbin Depo., Ex. 18 hereto at 47:13-48:15].

76.     G4S did not interview James Clark, the 3 Expert Auto contractors that actually inspected the damaged vehicles, anyone from USA Dent, or anyone from BSM. [G4S Report, Ex. 39 hereto; Durbin Depo., Ex. 18 hereto at 83:10-17, 146:3-11; Bishop Depo., Ex. 19 hereto at 248:12-249:1 (testifying that Landmark did not ask to interview any salespeople, managers, or anyone other than Tim Bishop between May 6th and the filing of this lawsuit on October 25th); Deposition of Brett Bargdill (6/25/21) ("Bargdill Depo."), attached hereto as Exhibit 40, at 21:1-6; Deposition of Phat Nguyen (2/10/21) ("Nguyen Depo."), attached hereto as Exhibit 41, at 36:7-10; Gilbertson Depo., Ex. 16 hereto at 54:13-17; Clark Depo., Ex. 24 hereto at 73:18-20; Cope Depo., Ex. 11 hereto at 81:14-21; Gianakon Depo., Ex. 33 hereto at 80:18-81:15; McKay Depo., Ex. 27 hereto at 54:10-15].

77.     Landmark's investigation did not even uncover weather reports of tornadic activity that were easily obtainable. [Durbin Depo., Ex. 18 hereto at 131:4-133:7; Gianakon Depo., Ex. 33 hereto at 76:11-22; Interactive Hail Maps Reports, attached hereto as Exhibit 42].

79557338.1

78.     During a July 18th call, Mr. Durbin confirmed that Landmark had no cause for concern from the information G4S provided, but still took the position that damage to the vehicles due to wind was man-made. [Bishop Decl., Ex. 1 hereto at ¶ 24].

79.     G4S's suggested additional investigation, "if desired," did not include highly sensitive deal jackets or information regarding actual repairs. [G4S Report, Ex. 39 hereto at Bates No. L001494].

80.     Landmark has not explained why its July 3rd letter stated that Landmark's "investigation to date" included wind speeds, but on July 18th stated that Landmark just recently retained G4S to do "preliminary research." [Bishop Decl., Ex. 1 hereto at ¶ 25].

## USA DENT REPAIRED EVERY VEHICLE

81.     Every witness on the premises of BSM's dealership testified that USA Dent spent several weeks, and retained numerous contractors, to repair the hundreds of vehicles damaged by the May 5, 2019 storm. [Bishop Depo., Ex. 8 hereto at 115:11-14, 235:3-20, 240:13-242:1; Bargdill Depo., Ex. 40 hereto at 21:20-23:13, 24:10-18, 27:20-25, 34:19-35:7; Nguyen Depo., Ex. 41 hereto at 22:3-23, 23:5-24:6, 24:16-25:9; Gilbertson Depo., Ex. 16 hereto at 40:1-15, 45:8-16, 45:20-46:6, 47:20-50:6, 50:13-25, 51:8-13; Sandifar Depo., Ex. 9 hereto at 9:12-17, 13:15-14:13, 14:24-15:8, 15:12-21, 18:17-19:14, 19:20-25; Hunt Depo., Ex. 10 hereto at 29:4-13, 44:7-45:12, 46:2-15, 47:14-48:2, 48:11-18; Rhead Depo., Ex. 5 hereto at 16:15-17:7, 17:17-19:22, 21:23-22:14, 62:6-18, 63:9-14; Cope Depo., Ex. 11 hereto at 26:6-11, 27:7-13, 29:20-31:5, 32:1-7, 32:21-33:3, 34:2-8, 36:19-25, 37:9-16; Steven Depo., Ex. 12 hereto at 33:12-22; Graham Depo., Ex. 13 hereto at 30:19-31:4, 32:6-13, 32:21-33:7, 33:24-34:6, 34:23-35:5, 35:20-25, 36:23-37:7; Pruitt

Depo., Ex. 14 hereto at 23:20-24:11, 28:20-29:8, 29:19-24, 30:8-31:4, 34:1-36:3, 38:13-39:13; Sanders Depo. I, Ex. 20 hereto at 92:17-21, 198:8-14].

82.    Every witness with first-hand knowledge testified that all of the vehicles had been repaired. [Nguyen Depo., Ex. 41 hereto at 21:19-22:2; Gilbertson Depo., Ex. 16 hereto at 41:19-42:11, 43:2-21, 58:4-7; Sandifar Depo., Ex. 9 hereto at 9:5-10:3, 12:18-24, 16:9-17:9, 60:7-12, 60:21-61:21, 63:22-64:7; Hunt Depo., Ex. 10 hereto at 56:21-57:11; Rhead Depo., Ex. 5 hereto at 66:23-68:24; Cope Depo., Ex. 11 hereto at 86:5-22; Graham Depo., Ex. 13 hereto at 38:18-23, 42:7-17; Pruitt Depo., Ex. 14 hereto at 55:23-56:19; Sanders Depo. I, Ex. 20 hereto at 89:3-9, 112:3-18, 113:9-18; Sanders Depo. II, Ex. 15 hereto at 259:2-11, 275:11-19].

83.    Landmark admits that it has no basis to dispute that the repairs were actually performed on the damaged vehicles. [Durbin Depo., Ex. 18 hereto at 115:2-16, 118:22-121:15].

<u>LANDMARK'S FAILURE TO PAY</u>

84.    Landmark asserts that it only need pay for actual repair costs, and that there are none here because USA Dent performed the repairs based on a percentage of the recovery from Landmark. [Durbin Depo., Ex. 18 hereto at 115:2-16, 118:22-121:15, 148:7-149:20; Bishop Depo., Ex. 18 hereto at 34:20-23].

85.    For this position, Landmark relies entirely on a policy provision that only applies where the policyholder does the repairs itself at Landmark's request, which Landmark admits did not happen here. [Policy, Doc. 27-1 at BSM00048, Section 4 (providing that "**if requested by the Company**, the Insured shall replace such unit or part thereof or furnish the labor and materials necessary for repairs thereto and the Company

shall pay only the actual cost to the insured" (emphasis added)); Durbin Depo., Ex. 18 hereto at 115:2-16, 118:22-121:15, 122:17-123:12].

86.     At no "time did Landmark communicate to Brandon Steven Motors that their claim would not be paid without actual costs incurred for the repairs." [Durbin Depo., Ex. 18 hereto at 150:7-13].

87.     At no "time did Landmark communicate to USA Dent that it would not be paid for the repair work without any actual costs of repairing" the vehicles. [*Id.* at 150:14-18].

88.     Landmark has stated that it does not know how the Policy operates in a situation like that here where a third party has repaired the vehicles on a percentage recovery basis. [*Id.* at 122:9-13 ("That's not my issue. I can't tell."), 122:17-123:12 ("The policy does not speak to that")].

89.     USA Dent made the repairs based upon the inspection it made jointly with Expert Auto and the resulting Expert Auto Appraisal. [Bishop Depo., Ex. 19 hereto at 47:10-49:15].

90.     Expert Auto sent spreadsheets to USA Dent to confirm they were in agreement on the Dollar amount for repairs. [Bishop Depo., Ex. 19 hereto at 226:19-227:6; D. Foster Depo., Ex. 6 hereto at 70:10-21]

91.     USA Dent relied on Expert Auto's agreed-upon value to repair the vehicles, which is the way it is has always been done between the parties and in the industry generally. [Bishop Depo., Ex. 19 hereto at 232:9-16, 233:7-11; Cope Depo., Ex. 11 hereto at 65:14-66:11, 82:6-83:10, 84:2-85:15; Steven Depo., Ex. 12 hereto at 93:10-23; Sanders Depo. II, Ex. 15 hereto at 266:25-268:6].

79557338.1

<u>LANDMARK'S CONTINUED DELAY</u>

92.     On July 30th Dan Durbin wrote that Landmark had "retained counsel and we are currently putting a document request letter together." [Doc. 27-2 at 3].

93.     Mr. Durbin further wrote that "I am reviewing the document supports we have collected so far at this time, so I do not have anything to provide to you regarding the wind v. hail split." [*Id.*].

94.     Mr. Durbin had confirmed three weeks prior to the July 30th email that Landmark had received the wind v. hail split. [7/9/19-7/10/19 Emails, Ex. 32 hereto].

95.     On August 8, 2019, Brandon Steven (BSM) sent an email to Dan Durbin (Landmark) outlining Landmark's delays and stated excuses for nonpayment over the prior three months, and demanding payment. [Doc. 27-2 at 1-3].

96.     Having not heard any response from Landmark, Mr. Steven sent a follow-up email to Mr. Durbin on August 13th, asking that Landmark "please kindly respond to my email." [*Id.* at 1].

97.     On August 14, 2019, Landmark's counsel sent a letter requesting eleven categories of documents and demanding, for the first time, an examination under oath. [Doc. 27-3].

98.     Landmark made the August 14th document request more than one-hundred days after BSM made its claim on May 6, 2019. [Bishop Decl., Ex. 1 hereto at ¶¶ 5-6; 5/6/19 Emails, Exs. 3 & 4 hereto].

99.     Kansas regulations require that "[e]very insurer shall complete investigation of a claim within thirty days after notification of claim, unless such investigation cannot

reasonably be completed within such time." Kansas Admin. Reg. § 40-1-34 & Unfair Claims Settlement Practices Model Regulations § 7.

100.    On August 20, 2019, counsel for BSM responded, stating that "Landmark now wants to completely restart its 'investigation' and treat this as a new claim." [Doc. 27-4 at 1].

101.    In his August 20th letter, BSM's counsel further stated:

Months ago, RSUI already had a team of adjusters at the BSM site gathering information for five full days. Additionally, BSM long ago provided almost all of the documents that Landmark now requests for a second time in its latest Letter. As set forth in Brandon Steven's August 8, 2019 email sent nearly two weeks ago, Landmark concluded at least two months ago that it only needed 'one more item' to finish this claim. There is simply no good faith basis for Landmark's extraordinary delay in paying on its insured's large loss, especially on the specious grounds that wind damage to vehicles was "man-made," even while the hail damage is uncontested. Landmark's request for an additional statement of proof of loss 100 days late, its request for documents already in its possession, and its attempt to further delay payment by scheduling an examination under oath two months from now is grossly unfair and prejudicial.

Even Landmark's Letter recognizes that its list of documents simply "attempts to encompass all records on a general category basis," without even attempting to discern what documents it already possesses or needs to finalize this claim. Such requests are not made in good faith 100 days after a loss. Landmark even goes so far as to tell its insured to explain if any of the documents "previously were produced," presumably because Landmark has not reviewed the documents itself. Although Expert Auto Claims (retained *by Landmark*) provided a spreadsheet with BSM's losses by June 24th, the vast majority of Landmark's Letter now focuses on gathering that very same information. Despite later retaining the investigative services of G4S to reboot the investigation and avoid payments to its insured, Landmark is once again attempting to avoid its payment obligations by retaining a law firm to now restart the investigation yet again. These manufactured obstructions to payment on this claim are out of line with an insurer's duties to its insured. Landmark had fifteen (15) days from the time of receiving proof of loss to accept or deny the claim, which time has long since passed. *See* Kan. Admin. Reg. § 40-1-34 (adopting Unfair Claims Settlement Practices Model Regulation, Section 8(A) & (C)). [*Id.* at 1-2].

102.   Landmark responded on August 30, 2019, asserting that BSM had not "produced **any** of the documents, **before or after my letter** was sent, responsive to Landmark's eleven (11) specific requests for documents." [Doc. 27-5 at 1 (emphasis added)].

103.   In a September 6th responsive letter, BSM's counsel pointed out that "over 120 days have now passed," and provided responsive documents, while explaining how most had already been received (and created) by Landmark. [Doc. 27-6].

104.   Specifically, BSM provided the following responses to Landmark's 11 categories of documents:

- **Landmark Request No. 1 – "A list of each vehicle claimed as damaged by hail and/or wind on May 5, 2019, including the make model, and year of each vehicle."**

  BSM Response – Attaching as Exhibits 1 & 2 the notice of loss and inventory listings already sent on May 6th, as Exhibit 3 the May 17 Expert Auto Claims spreadsheet with a detailed list of damaged vehicles, and as Exhibit 4 the June 25th Expert Auto Claims updated spreadsheet. Landmark had these documents for months prior.

- **Landmark Request No. 2 – "The physical vehicle inventory at Eddy's Chrysler Dodge Jeep Ram on May 5, 2019."**

  BSM Response – Pointing out that this was already sent to Landmark on May 6th, and resending as Exhibit 1.

- **Landmark Request No. 3 – "All documents reflecting BSM's ownership interest in the claimed damaged vehicles on May 5, 2019, including, but not limited to, title documents, bills of sale, and floor plan agreements."**

  BSM Response – Stating that Expert Auto Claims spent several days at the dealership and that it was inappropriate to now raise questions of ownership. BSM further stated that "[r]egardless, attached as Exhibit 6 is Bank of America's May 2019 floorplan statement showing ownership of the vehicles that were floored at any time in the month of May. Additionally, attached as Exhibits 7 & 8, respectively, are new and used vehicle inventory schedules. These reports identify the vehicle stock number, date in inventory, and floorplan amount/date for the vehicles."

- **Landmark Request No. 4 – "All floor plan insurance policies providing coverage for any of the vehicles claimed as damaged on May 5, 2019, including any certificates of insurance issued to BSM or on BSM's behalf in connection with any such policies."**

  BSM Response – "None."

- **Landmark Request No. 5 – "All floor plan or inventory financing agreements for any of the vehicles claimed as damaged on May 5, 2019."**

  BSM Response – "*See* attached Exhibit 6."

- **Landmark Request No. 6 – "All estimates, proposals, quotes, scopes of repair, assessments or other similar documentation to repair the claimed damages to the vehicles as a result of hail and/or wind on May 5, 2019."**

  BSM Response – "Request No. 6 is especially troubling since Landmark itself sent out the Expert Auto adjusters that did the inspection and prepared assessments of the damaged vehicles. BSM did not do an independent assessment, and has relied wholly upon Landmark's adjusters (as Landmark already knows). That assessment is attached hereto as Exhibit 4, which Landmark has had in its possession for months."

- **Landmark Request No. 7 – "All invoices, receipts, proposals, estimates or other documents reflecting any actual repairs of the claimed damages to the vehicles as a result of hail and/or wind on May 5, 2019."**

  BSM Response – "Request No. 7 fails to recognize that the policy provides coverage for Actual Cash Value and is not based upon the actual repairs. Regardless, BSM had an oral agreement with USA Dent to make the repairs based upon the spreadsheet created by Expert Auto that Landmark has had in its possession since June."

- **Landmark Request No. 8 – "All receipts, invoices, deal files/deal jackets, damage disclosure forms, or other documents for each vehicle claimed as damaged by hail and/or wind on May 5, 2019, which have been sold by BSM on or after May 5, 2019."**

  BSM Response – "Request No. 8 is likewise irrelevant because it fails to recognize that the policy provides Actual Cash Value coverage. The spreadsheet provided in June by Expert Auto contains all of the individual vehicle adjustments for each vehicle."

- **Landmark Request No. 9 – "All appraisals or other evaluations of each vehicle claimed as damaged by hail and/or wind on May 5, 2019."**

BSM Response – "As stated previously, Expert Auto (retained by Landmark) did the only evaluations of these vehicles in May and June. BSM has not done any appraisals."

- **Landmark Request No. 10 – "All photographs or videos which depict the claimed damages to the vehicles as a result of hail and/or wind on May 5, 2019."**

   BSM Response – "Expert Auto took all of the photographs or videos taken of the damaged vehicles and sent them to Landmark. Any such photographs or videos have been in Landmark's possession for months. In an email dated June 7th, Landmark stated that 'the photos have been received' from the Expert Auto adjusters. Landmark's current statement that it has not received these is completely unacceptable and untrue."

- **Landmark Request No. 11 – "All photographs or videos which depict all vehicles located at Eddy's Chrysler Dodge Jeep Ram before May 5, 2019."**

   BSM Response – "Any such photographs or videos, to the extent they exist, would be archived on BSM's website at **Error! Hyperlink reference not valid.**. Landmark is welcome to make such a search."

   [Doc. 27-6].

105.   Landmark took the examination under oath of Tim Bishop, on behalf of BSM, on September 27, 2019. [Bishop EUO, Ex. 17 hereto].

106.   Nothing from the examination under oath changed the amounts owing that had already been determined by Landmark's own retained adjusters over three months earlier, and was all information already known to Landmark or that could have been discovered by Landmark within the first thirty days of claim. [*See generally id.*].

107.   BSM's counsel sent emails to Landmark's counsel on October 3rd, October 4th, October 7th, October 10th, October 11th, October 14th, and October 15th demanding payment on the claim first made on May 6th. [October Emails, attached hereto as Exhibit 43].

108.     Other than one phone call on October 6th, Landmark did not respond to these demands for a response and for payment. [*Id.*].

109.     On October 16th, BSM's counsel sent a letter to Landmark's counsel stating that "[t]here is simply no dispute here and payment should have been made months ago. Please confirm by Monday, October 21, 2019, that Landmark will make payment for the amounts documented by its adjusters, with interest for the past 5 ½ months." [Doc. 27-7 at 2].

110.     As of this filing, Landmark has not paid anything, nor offered to pay anything, on BSM's May 5, 2019 loss. [Bishop Decl., Ex. 1 hereto at ¶ 26].

## SETTLEMENT OF EDDYS SUBARU, EDDYS VOLVO CLAIMS AND OTHER CLAIMS

111.     On June 19, 2019, BSM affiliates Eddys Subaru of Wichita and Eddys Volvo Wichita submitted a claim to Landmark for storm damage to their vehicles under the very same Policy as that at issue here. [Bishop Decl., Ex. 1 hereto at ¶ 29].

112.     Landmark sent adjusters from Expert Auto Claims to inspect the damages to the vehicles at Eddys Subaru and Eddys Volvo, just as it did here. [*Id.* at ¶ 30].

113.     The same individual at Expert Auto Claims – Donna Foster – prepared the estimate of the damages at Eddys Subaru and Eddys Volvo. [*Id.* at ¶ 31; Ex. 25 hereto at 1].

114.     Landmark paid Actual Cash Value for the losses at Eddys Subaru and Eddys Volvo based on the estimates prepared by Expert Auto Claims, minus the applicable deductibles. [Bishop Decl., Ex. 1 hereto at ¶¶ 32-35; Landmark checks sent to BSM, attached hereto as Exhibit 44].

115.    Both checks sent by Landmark for payment of losses at Eddys Subaru and Eddys Volvo state in the subject line that they were "IN PAYMENT FOR NET ACV HAIL DMG." [Bishop Decl., Ex. 1 hereto at ¶¶ 34-35; Ex. 44 hereto].

116.    Landmark did not request the deal jackets, actual repair costs, or information regarding sale of the damaged vehicles in order to pay the losses at Eddys Subaru and Eddys Volvo. [Bishop Decl., Ex. 1 hereto at ¶ 36].

117.    Landmark admits that its payment for wind and hail damage for a March 9, 2019 loss, where Landmark paid based on an adjuster's valuation, was made in compliance with the policy terms. [First Amended Responses, RFA No. 24, attached hereto as Exhibit 45].

118.     Landmark has previously paid based on their adjuster's valuation. [Bishop Depo., Ex. 8 hereto at 250:13-251:17].

<u>THE POLICY</u>

119.    The Policy requires Landmark to pay for "direct physical destruction, theft or damage to a covered 'automobile,'" caused by "any external cause," including hail and windstorm. [Doc. 27-1 at pp. 10 & 12 of 41, under "Comprehensive" and "Loss"].

120.    The Policy further provides that "[i]n the event of any loss or damage covered hereunder the Insured shall give the Company a reasonable time and opportunity to examine the insured units before any repairs are begun or any physical evidence of damage removed." [*Id.* at p. 19 of 41, § IX(2)].

121.    There is a $2,500,000 limit of liability per occurrence under the Policy, with a "$1,500 Per Vehicle Per Occurrence" deductible for Windstorm or Hail coverage. [*Id.* at pp. 13 & 25 of 41, § IV & End't No. 2].

122.    The Policy also contains the following additional provisions:

**OCCURRENCE:** "Occurrence" means any one "loss", disaster, casualty or series of "losses", disasters, or casualties, arising out of one event. When the term applies to "loss" or "losses" from the perils of tornado, cyclone, hurricane, windstorm, hail . . . one event shall be construed to be all "losses" arising during a continuous period of 72 hours.

**WINDSTORM:** shall mean an atmospheric disturbance marked by high winds, with or without precipitation, including such events as hurricane, typhoon, rainstorm, hailstorm, tornado, or any combination of the foregoing events.

## IX. CLAIMS REPORTING AND ADJUSTMENT:

4. PAYMENT OF LOSS. The Company at it's (sic) sole option may pay for the loss in money or may repair or replace the damaged or stolen unit or part thereof but if requested by the Company, the Insured shall replace such unit or part thereof or furnish the labor and materials necessary for repairs thereto and the Company shall pay only the actual cost to the insured. . . .

6. APPRAISAL. If the Insured and the Company fail to agree as to the amount of loss, either may, within sixty (60) days after proof of loss is flied (sic), demand an appraisal of the loss, In (sic) such event the Insured and the Company shall each select a competent Appraiser and the Appraiser shall select a competent and disinterested Umpire. The Appraisers shall state separately the Actual Cash Value and the amount of loss and falling (sic) to agree shall submit their differences to the Umpire. Agreement in writing of any two shall determine the amount of loss. . . .

## X. BASIS OF LOSS SETTLEMENT AND ADJUSTMENT:

**A.** In the event of a partial "loss" to any "automobile" insured hereunder which is not settled on an appearance damage basis, "We" will calculate settlement as follows:

Labor rates will be calculated as ninety percent (90%) of participating dealer's customary insurance labor rates. Parts, paint and any other materials will be calculated at seventy-five percent (75%) of participating dealer's customary retail cost. If the participating dealer subcontracts all or part of the repairs to a repair facility in which they, their officers, shareholders or employees have no financial interest, "We" will make settlement at the cost to the participating dealer, subject to this rate being approved by "Us".

**B.** In the event of "loss" to a covered "automobile"
    **1.** "We" may, at "Our" option:

a) Pay for, repair or replace a damaged or stolen "automobile"; or

b) Return "automobiles" which are stolen, at "Our" expense, and pay for the repair cost to the "automobile"; or

c) Take all or any part of the damaged or stolen "automobile" at an agreed or appraised value;

**2.** "We may elect to adjust the "loss" with the participating dealer.

**D.** The "Insured" agrees to use paintless dent repair procedures where legally permitted. If repairs are not completed using paintless dent repair procedures, where legally permitted, "We" will not pay more than the amount that would have been incurred for necessary expenses using this method of repair.

[Doc. 27-1 at pp. 12 & 19-22 of 41].

123.    "Appearance damage basis" is where the parties agree on the value of damage. [Snead Depo., Ex. 2 hereto at 50:9-20].

124.    BSM understood the Policy to be based on actual cash value, as that is how Landmark presented the Policy during underwriting. [Bishop Depo., Ex. 8 hereto at 262:2-263:5, 265:5-14, 267:18-23]

125.    The quotes and binders that Landmark prepared in order for BSM to purchase the Policy all state that coverage would be on an "Actual Cash Value" basis. [Snead Depo., Ex. 2 hereto at 55:11-56:15; 5/17/18 Quote, attached hereto as Exhibit 46, under "Valuation;" 7/26/18 Quote, attached hereto as Exhibit 47, under "Valuation;" 8/31/18 Binder, attached hereto as Exhibit 48, under "Valuation;" 9/6/18 Binder, attached hereto as Exhibit 49, under "Valuation"].

126.    Landmark paid out on other claims for this Policy on an actual cash value basis, with the payment checks even stating "ACV." [Bishop Depo., Ex. 19 hereto at 267:24-268:16; Landmark checks, Ex. 44 hereto].

127.    Exclusion B.2. excludes loss that "is caused by, results from or arises out of . . . [d]ishonest acts by 'You', your employees, your authorized representatives, or anyone entrusted with the 'automobile', whether acting alone or in collusion with others, and regardless of the hours of employment." [Policy, Doc. No. 27-1 at VII(B)(2)].

128.    Section IX(7) under "Claims Reporting and Adjustment" provides that "This entire Insurance shall be void if the Insured has concealed or misrepresented any fact or circumstance concerning this Insurance or the subject matter hereof or. (sic) in the case of any fraud, attempted fraud or false swearing by the Insured touching any matter relating to this Insurance or the subject matter hereof, whether before or after a loss." [Policy, Doc. No. 27-1 at IX(7)].

<u>LANDMARK HAS NOT IDENTIFIED ANY FRAUD BY BSM</u>

129.    Landmark's corporate representative testified that he was not aware of anything fraudulent in the communications sent by BSM for this claim. [Durbin Depo., Ex. 18 hereto at 24:21-25:7, 25:21-26:3].

130.    Landmark's only allegation that BSM concealed a material fact is that the wind damage was (according to Landmark) man-made, but Landmark admits that it has no facts or evidence that BSM had any knowledge of alleged man-made wind damage. [*Id.* at 141:9-142:6, 142:18-143:14].

131.    Landmark did not take any photographs documenting any damage allegedly caused by a metal object. [*Id.* at 29:20-30:20]

132.    Landmark cannot point to anything besides James Clark to say that wind damage was illegitimate. [*Id.* at 126:10-127:4].

79557338.1

133.    Multiple witnesses testified that they observed wind damage to the sides of the vehicles right after the storm. [Hunt Depo., Ex. 10 hereto at 59:10-60:8 (personally observing both hail damage on top of the vehicles as well as scratches on the sides of vehicles at the BSM dealership from the May 5, 2019 storm); Graham Depo., Ex. 13 hereto at 41:21-42:3 (personally observed that vehicles had damage on the sides as well as the top); Sanders Depo. II, Ex. 15 hereto at 268:7-270:8].

134.    James Clark relied upon there only being straight line wind for his conclusion that the wind damage to 5 or 6 vehicles was suspicious, but even the weather reports relied upon by G4S show wind in multiple directions at the storm's peak. [Durbin Depo., Ex. 18 hereto at 138:11-140:14].

135.    The only fraud investigator retained by Landmark testified that he did **not** "find any evidence that [the] suspected fraud came from Brandon Steven Motors." [Gianakon Depo., Ex. 33 hereto at 118:16-20].

<u>LANDMARK CHOSE NOT TO INVESTIGATE</u>

136.    Landmark's corporate representative testified that: "I don't think we are saying they weren't damaged by the covered loss, we are just saying we don't have a completed investigation." [Durbin Depo., Ex. 18 hereto at 125:1-126:9; Clark Depo., Ex. 24 hereto at 45:20-22].

137.    Landmark's corporate representative admits that its only contention for not being able to complete its investigation is not having received documentation of actual repair costs, which documentation does not exist because USA Dent performed the repairs on a percentage of recovery basis. [Durbin Depo., Ex. 18 hereto at 144:20-145:7; Bishop Depo., Ex. 8 hereto at 95:12-23, 96:22-97:17, 144:6-23, 233:16-21 (stating that USA Dent

did not provide any documentation to BSM); Sanders Depo. I, Ex. 20 hereto at 62:11-63:13, 86:6-13, 112:19-113:8 (stating that there is no written documentation of the repairs performed)].

138.    Similarly, Landmark's only allegation that BSM failed to cooperate is that it did not provide the cost of repairs, which does not exist because USA Dent repaired the vehicles on a percentage of recovery basis. [Durbin Depo., Ex. 18 hereto at 143:23-144:15; Bishop Depo., Ex. 8 hereto at 95:12-23, 96:22-97:17, 144:6-23, 233:16-21 (stating that USA Dent did not provide any documentation to BSM), 260:7-17, 261:2-6; Sanders Depo. I, Ex. 20 hereto at 112:19-113:8].

139.    The only documents that Landmark alleges it needed and was not provided are the actual repair costs to the damaged vehicles. [Durbin Depo., Ex. 18 hereto at 57:16-58:7, 123:16-124:19 (the insured "did not provide . . . the actual repair costs that were done for each vehicle")].

140.    Landmark understood from the beginning that USA Dent would take a percentage in payment for repair of vehicles. [Durbin Depo., Ex. 18 hereto at 59:6-25; Steven Depo., Ex. 12 hereto at 44:13-45:8; 48:4-13; Sanders Depo. I, Ex. 20 hereto at 139:11-25, 162:8-163:13].

141.    Landmark knew from the beginning that there was a storm and hail damage to the vehicles. [Durbin Depo., Ex. 18 hereto at 64:12-21].

142.    Landmark has no dispute on the hail damage to the vehicles. [*Id.* at 65:1-18].

79557338.1

<u>THE EXPERT AUTO INDEPENDENT CONTRACTOR INSPECTORS ALL
TESTIFIED THAT THE DAMAGE TO BSM'S VEHICLES WAS OBVIOUSLY
CAUSED BY THE STORM</u>

143.   Expert Auto sent three independent contractors – Billy Matthews, John Harris, and William Roberts – who personally inspected BSM's hundreds of damaged vehicles. [Matthews Depo., Ex. 34 hereto at 13:11-14:5; Roberts Depo., Ex. 36 hereto at 12:1-7; Harris Depo., Ex. 35 hereto at 14:7-11; Clark Depo., Ex. 24 hereto at 32:5-18, 34:2-35:3, 31:16-19, 36:14-20].

144.   Their responsibility was to personally inspect the damage and report it to Expert Auto in order to prepare the Expert Auto Appraisal that would be used to pay BSM on its loss. [Matthews Depo., Ex. 34 hereto at 9:19-10:8, 12:16-19].

145.   All three independent contractors testified that they observed hail and wind damage to BSM's vehicles and reported that to Expert Auto. [Matthews Depo., Ex. 34 hereto at 14:8-11, 14:18-15:2, 19:4-8; Harris Depo., Ex. 35 hereto at 14:7-11, 16:2-17:6; Roberts Depo., Ex. 36 hereto at 12:10-14:6, 14:15-15:2; Clark Depo., Ex. 24 hereto at 43:20-25, 56:25-57:7].

146.   Mr. Matthews testified that he has "no doubt" that the damage was caused by weather, as this was "pretty obvious," and he independently looked at the wind damage himself. [Matthews Depo., Ex. 34 hereto at 15:5-11, 18:14-24, 20:10-15].

147.   None of the three inspectors observed anything questionable about the damages, as they would have reported anything questionable to Expert Auto. [Matthews Depo., Ex. 34 hereto at 20:21-21:5, 21:23-22:12, 25:20-26:1; Harris Depo., Ex. 35 hereto at 14:7-11, 14:15-17, 15:4-20; Roberts Depo., Ex. 36 hereto at 13:16-14:6].

79557338.1

148.   All three inspectors testified that all of the damages they observed and reported to Expert Auto were consistent with wind and hail damage. [Matthews Depo., Ex. 34 hereto at 25:12-19; Harris Depo., Ex. 35 hereto at 16:2-17:6; Roberts Depo., Ex. 36 hereto at 14:15-15:2; *see also* Gilbertson Depo., Ex. 16 hereto at 57:6-24; Hunt Depo., Ex. 10 hereto at 59:10-60:8 (personally observing both hail damage on top of the vehicles as well as scratches on the sides of vehicles at the BSM dealership from the May 5, 2019 storm); Sanders Depo. II, Ex. 15 hereto at 268:7-270:8].

## **ARGUMENT**

"Summary judgment is appropriate in cases where the record discloses no genuine issue of any material fact." *Self v. Crum*, 439 F.3d 1227, *1230 (10th Cir. 2006). "To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Id.* ("Summary judgment requires more than mere speculation"); *accord Johannes v. Idol*, 39 Kan. App. 2d 595, 603, 181 P.3d 574, 581 (2008) ("[M]ere speculation is insufficient to avoid summary judgment"). A case may be decided "on summary judgment when the facts present only one reasonable conclusion." *Napell v. Aten Dept. Store, Inc.*, 115 F. Supp. 2d 1275, 1278 (D. Kan. 2000). Moreover, "factual disputes about immaterial matters are irrelevant to a summary judgment determination." *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1361 (10th Cir. 1993). "[I]t is not enough that the nonmovant's evidence be 'merely colorable' or anything short of 'significantly probative;' the nonmovant must come forward with specific facts showing a genuine issue for trial." *Id.*, *accord  Muhl v. Bohi*, 37 Kan. App. 2d 225, 229, 152 P.3d 93, 97–98 (2007) (citing *Mitchell v. City of Wichita*, 270 Kan. 56, 59, 12 P.3d 402 (2000)) ("An issue of fact is not genuine unless it has legal controlling force as to the controlling

37

issue. . . . If the disputed fact, however resolved, could not affect the judgment, it does not present a genuine issue of material fact").

## I.     THE POLICY COVERS THE DAMAGES TO BSM'S VEHICLES

The Open Lot Policy provides coverage for "direct physical destruction, theft or damage to a covered 'automobile,'" caused by "any external cause." [SOF, ¶ 119]. The vehicles here suffered direct physical damage from an external cause. [*Id.*, ¶¶ 6-8, 81-83, 136, 141-148]. Landmark itself is forced to admit that "I don't think we are saying they weren't damaged by the covered loss, we are just saying we don't have a completed investigation." [*Id.*, ¶ 136]. Every single witness to observe the vehicles, including Landmark's own witnesses, confirm that the vehicles suffered physical damage from an external cause. [*Id.*, ¶¶ 6-8, 81-83, 136, 141-148].

## II.    NO POLICY EXCLUSIONS APPLY AS A MATTER OF LAW

"[T]he burden of proof rests upon the insurer to prove the facts which bring the case within [an] exclusion." *Westchester Fire Ins. Co. v. City of Pittsburg*, 768 F. Supp. 1463, 1469 (D. Kan. 1991) (finding exclusion inapplicable); *accord Kansas State Bank and Trust Co. v. Emery Air Freight Corp.*, 656 F. Supp. 200, 203 (D. Kan. 1987) (same). "The policy should be construed in favor of the insured and the exclusion must be strictly construed against the insurer . . . ." *Upland Mut. Ins. Inc. v. Noel*, 519 P.2d 737, 740-41 (Kan. 1974); *accord Park Univ. Ent. Inc. v. American Cas. Co. of Reading*, 314 F. Supp. 2d 1094, 1106 (D. Kan. 2004) ("Exclusions must be strictly construed against the insurer"); *Kansas State Bank and Trust Co. v. Emery Air Freight Corp.*, 656 F. Supp. 200, 202-3 (D. Kan. 1987) ("As a general rule, exclusions or limitations in a policy are narrowly construed").

## A.    BSM Did Not Engage In Any Dishonest Acts

Landmark points to just one exclusion to justify its failure to pay. Exclusion B.2. excludes loss that "is caused by, results from or arises out of . . . [d]ishonest acts by 'You', your employees, your authorized representatives, or anyone entrusted with the 'automobile', whether acting alone or in collusion with others, and regardless of the hours of employment." [SOF, ¶ 127]. Provision IX(7), although not listed as an exclusion, similarly provides that "[t]his entire Insurance shall be void if the Insured has concealed or misrepresented any fact or circumstance concerning this Insurance or the subject matter hereof or. (sic) in the case of any fraud, attempted fraud or false swearing by the Insured touching any matter relating to this Insurance or the subject matter hereof, whether before or after a loss." [*Id.*, ¶ 128].

Landmark has a total failure of proof to satisfy this exclusion. Landmark admits that there was nothing fraudulent in the communications that BSM sent for this claim. [*Id.*, ¶ 129]. Rather, Landmark relies entirely on its "suspicion" that some wind damage was man-made. [*Id.*, 130]. The only person to allege that he saw suspicious wind damage was James Clark. [*Id.*, ¶¶ 42-53]. Landmark admits that it relies entirely on Mr. Clark for this exclusion. [*Id.*, ¶ 132]. The three independent inspectors that spent far more time reviewing the damages, and inspected all of the vehicles, testified that the damages were caused by the storm and were not suspicious. [*Id.*, ¶¶ 143-148]. All other witnesses that viewed the damages also testified that they came from the storm. [*Id.*, ¶¶ 53, 133]. Mr. Clark admits that he cannot speculate as to the damages to the hundreds of other vehicles, other than the 5-6 he specifically reviewed, and admits that his suspicions were based on straight-line winds. [*Id.*, ¶¶ 52, 134]. Landmark did nothing to document its suspicions. [*Id.*, ¶ 131]. Mr.

Clark also admits that he does not know who was involved with what he believed were suspicious damage to the 5 or 6 vehicles, or whether anybody at BSM was involved. [*Id.*, ¶¶ 50, 52]. Nor could the G4S investigator make any such determination, specifically stating that he did **not** "find any evidence that [the] suspected fraud came from Brandon Steven Motors." [*Id.*, ¶¶ 69-71, 78, 135].

Moreover, insurance companies have an obligation to report fraud to the state when they know or have reasonable suspicion that it exists. [SOF, ¶ 69]; K.S.A. § 40-2,118(b) ("An insurer that has knowledge or a good faith belief that a fraudulent insurance act is being or had been committed shall provide to the commissioner, on a form prescribed by the commissioner, any and all information and such additional information relating to such fraudulent insurance act as the commissioner may require"). Here, G4S did not make a state fraud claim because it did not have reasonable suspicion of fraud and of who committed the fraud. [SOF, ¶¶ 71]. Landmark has acknowledged that it cannot dispute that the state fraud referral was not warranted. [*Id.*, ¶ 72].

Accordingly, Landmark lacks any evidence to support its burden of proving that BSM or its representatives engaged in any dishonest acts.

### B.   Landmark Had Every Opportunity to Conduct its Investigation

Landmark has asserted that it did not have an opportunity to conduct its investigation, and thus has not paid, even though this ground for denying payment is not found in the Open Lot Policy's exclusions. Although not a ground to deny coverage anyway, the discovery in this case leaves no room for such an assertion. Upon learning of Mr. Clark's concerns, rather than conduct a thorough investigation, Landmark did everything in its power to limit any such investigation and instead use Mr. Clark as an

79557338.1

excuse to drag out payment indefinitely. It is undisputed that Landmark took the following

steps to **avoid** investigating Mr. Clark's suspicions:

- Landmark instructed Expert Auto and G4S not to inform BSM about the suspicions. [SOF, ¶¶ 47-51, 68, 73, 76];

- Landmark instructed Expert Auto to continue the inspections and to allow the damaged vehicles (and any evidence they carried) to be repaired. [*Id.*, ¶¶ 47-51];

- Landmark authorized a very "limited investigation" that only allowed G4S to perform specified tasks that took a total of 4.1 hours, at a total cost of $1,340.43. [*Id.*, ¶¶ 57, 73];

- Landmark intentionally removed the G4S objective of determining whether the wind damage was legitimate or man-made. [*Id.*, ¶¶ 58-59];

- G4S recommended an additional social media search, which Landmark rejected. [*Id.*, ¶¶ 63-65];

- G4S recommended a review of the vehicle damages, which Landmark rejected. [*Id.*, ¶¶ 63-64, 66];

- G4S recommended an interview with BSM, which Landmark rejected. [*Id.*, ¶¶ 63-64, 66];

- G4S recommended an interview with James Clark – the only witness upon whom Landmark based its decision not to pay – but Landmark rejected even this recommendation. [*Id.*, ¶¶ 63-64, 67];

- Landmark did not even send to G4S any photos of the vehicles to review. [*Id.*, ¶ 66];

- Landmark directed G4S not to speak with anyone who had firsthand knowledge of BSM's loss. [*Id.*, ¶ 68];

- G4S did not make a state fraud referral because it did not have reasonable suspicion of fraud being committed by a particular person or organization. [*Id.*, ¶¶ 69-71];

- Landmark has acknowledged that it has no grounds for asserting that a state fraud referral was warranted. [*Id.*, ¶ 72];

- As of June 21, 2019, Landmark's adjuster knew that Landmark should "let G4S go ahead and interview the insured and their contractor, USA Dent," and yet still chose not to do so. [*Id.*, ¶ 75];

- Not only did Landmark refuse to interview Mr. Clark, BSM, or Expert Auto, but it also refused to even interview the three independent inspectors sent by Expert Auto that personally reviewed the vehicle damages over the course of ten days. [*Id.*, ¶ 76];

- G4S' 4.1-hour investigation (including report drafting) did not include weather reports that were publicly accessible showing tornadic-type activity. [*Id.*, ¶ 77];

- Expert Auto did not do any additional work after preparing its June 24, 2019 Appraisal. [*Id.*, ¶ 20]; and

- Landmark ended G4S' investigation and did not allow for any additional work to be done after June 17, 2021. [*Id.*, ¶¶ 54-76].

The undisputed facts thus show that Landmark simply chose not to investigate as an indefinite excuse to avoid payment. Landmark admits that BSM was "very" responsive to requests during the claims process. [*Id.*, ¶¶ 17-18]. Indeed, Landmark's only contention for not completing its investigation is that it did not receive documentation of the actual repairs and costs from USA Dent. [*Id.*, ¶ 137]. As the uncontroverted evidence shows, such documents do not exist because USA Dent performed repairs based on its joint review with Expert Auto and the resulting Expert Auto Appraisal. [*Id.*, ¶¶ 138-140]. USA Dent had already agreed with Landmark's adjuster, Expert Auto, as to the amount of damages and dollar figure. [*Id.*, ¶¶ 89-91].

Landmark has no basis for asserting that it did not have an opportunity to investigate.

## III.    BSM IS ENTITLED TO RECOVER $2,300,949.19 UNDER THE POLICY

### A.    Landmark and BSM Already Agreed to This Amount, and Landmark Admits That This Amount Was Calculated In Conformance with the Policy's Requirements

Landmark (not BSM) retained Expert Auto Claims to provide "estimates for vehicle dealer inventories . . . to allow [Landmark] to cut checks to [BSM] so they can repair vehicles." [SOF, ¶¶ 12, 14]. This is consistent with industry standards, as "[e]stimates of repair costs are the time-honored means of proving what the repair costs will be . . . ." *Couch on Insurance*, § 175:51. Unless insurance carriers choose to repair vehicles themselves, their own estimates of repair set the minimum amount owing for a vehicle repair. *See, e.g., Security Storage Properties v. Safeco Ins. Co. of Am.*, 2009 WL 1440248, *3 (D. Kan. May 18, 2009) (Insurance carrier offered to pay on estimate of repairs, but insured disagreed with the estimate). The very purpose of these estimates is to establish the amount owing under a policy.

Payment on these estimates is so well established that failure to pay the estimated amount is considered arbitrary and capricious. *See, e.g., Bjornestad v. Progressive Northern Ins. Co.*, 664 F.3d 1195, 1199-1200 (8th Cir. 2011) (finding that insurance carrier's offer of payment for less than its own estimate was vexatious or without reasonable basis); *Ranzino v. Allstate Ins. Co.*, 210 So. 2d 907, 911 (Ct. App. La. 1968) (recognizing that carrier's failure to tender the adjuster's estimate would have been arbitrary and capricious, except for the fact that "the only reason it did not tender the amount of its adjuster's estimate was plaintiff's contention the car was a total loss and plaintiff would have rejected any other offer of settlement"). Landmark has no such excuse for not paying its own estimate here. [*See* SOF, ¶¶ 21-24].

Moreover, the very method of adjusting the claim used by Expert Auto Claims is the same as that referenced in the Policy and paid by other carriers. [*Compare* SOF, ¶ 14 (stating that Expert Auto Claims "specialize[s] in appraisals utilizing Paintless Dent Repair as the method of restoration") *with* SOF, ¶ 65 at § X(D) (stating under the Policy that Landmark "will not pay more than the amount that would have been incurred for necessary expenses using [the Paintless Dent Repair] method of repair" where "legally permitted")]; *accord Pete's Car Smart, Inc.*, 2005 WL 8158546 at *1 (insurance carrier adjusted the claim and offered to pay based on the PDR method for "dents on hail-damaged vehicles"). Landmark itself admits that the Expert Auto Appraisal was prepared in conformance with the Open Lot Policy's terms. [SOF, ¶¶ 23-24].

Landmark has no valid basis to now dispute the Expert Auto Appraisal it ordered. Indeed, Landmark did not elect to repair the vehicles, had ample time to examine the insured units, and thus must now pay Expert Auto Claims' adjusted amount of $2,300,949.19. [SOF, ¶¶ 119-120, 122 at § IX(4) (providing that Landmark "may [1] pay for the loss in money or [2] may repair or replace the damaged or stolen unit or part thereof")]. Landmark must now pay for the loss in money, in the amount already determined by its appraiser.[2]

### B.     $2,300,949.19 is the "Appearance Damage Basis" Provided for in the Policy

---

[2] Although irrelevant to Landmark's obligation to pay, BSM did have the vehicles repaired by USA Dent and made a $150,000 payment to USA Dent over two years ago. [SOF, ¶¶ 28, 81-83]. BSM has remained out of pocket for this amount during the past two years, and USA Dent and many of its independent contractors remain unpaid. [*Id.*, ¶ 28].

The Open Lot Policy provides for a calculation of settlement that only applies "[i]n the event of a partial 'loss' to any 'automobile' insured hereunder **which is not settled on an appearance damage basis**." [SOF, ¶ 122 at X(A) (emphasis added)]. The Open Lot Policy does not define "appearance damage basis." [*Id.*]; *see North American Specialty Ins. Co. v. Correctional Med. Servs. Inc.*, 527 F.3d 1033, 1040-41 (10th Cir. 2008) ("[I]f undefined terms are ambiguous, rules of construction will apply and ambiguous provisions will be construed against the insurer"). Landmark's corporate representative agrees that "appearance damage basis" is where the parties agree on the value of damage. [SOF, ¶ 123]. As both Landmark and BSM agreed on the $2,300,949.19 figure, this is the appearance damage basis that Landmark must now pay.

### C. Alternatively, $2,300,949.19 is the Actual Cash Value of the Loss That Landmark Must Pay

#### 1. The Policy Requires a Minimum Payment of Actual Cash Value

Landmark itself made numerous representations, in both policy quotes and policy binders, that the Policy pays out on an "Actual Cash Value" basis. [SOF, ¶¶ 124-125]. The Policy provides that *if* BSM and Landmark "fail to agree as to the amount of loss, either may . . . demand an appraisal of the loss. In such event the Insured and the Company shall each select a competent Appraiser and the Appraiser shall select a competent and disinterested Umpire. The Appraisers shall state separately the **Actual Cash Value** and the amount of loss and falling (sic) to agree shall submit their differences to the Umpire. [*Id.*, ¶ 122 at § IX(6) (emphasis added)]. Accordingly, at a bare minimum, BSM is entitled to recover the actual cash value ("ACV") of its claim, as that is the measurement by which to

resolve any dispute over loss amounts.[3] As set forth above, this is also consistent with standard industry practices. *See, e.g., Gowing v. Great Plains Mut. Ins. Co.*, 207 Kan. 78, 81 (1971) ("Unclear and obscure clauses in a policy of insurance should not be permitted to defeat the coverage which is reasonably to be expected by the insured").

### 2.     The Parties' Prior Course of Performance Shows Payment Based On Actual Cash Value & Pursuant to Expert Auto Claims' Appraisal

"Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." Restatement (2d) of Contracts § 202. Here, Landmark settled a claim for vehicle damage at Eddys Subaru of Wichita and Eddys Volvo Wichita (BSM affiliates), for a storm that took place 45 days after that in the current dispute, under the very same Policy. [SOF, ¶¶ 111-115]. Landmark paid based on the estimate prepared by Expert Auto Claims. [*Id.*, ¶¶ 113-114]. In making payment, Landmark made clear that it was "in payment for net *ACV* Hail Dmg/Subaru" and "in payment for net *ACV* hail dmg/Volvo." [*Id.*, ¶ 115 (emphasis added)]. There is no question that the parties have previously treated the Policy as providing for Actual Cash Value, and treated the Expert Auto Claims estimate as establishing the Actual Cash Value amount. Landmark did not request deal jackets, actual repair costs, or information regarding sale of the damaged vehicles in order to pay the losses at Eddys Subaru and Eddys Volvo. [*Id.*, ¶ 116].

---

[3] Landmark has never presented a loss amount other than the $2,300,949.19 estimated by Expert Auto Claims, so there should not even be a dispute. [SOF, ¶ 27]. Regardless, the Policy requires at least actual cash value for the loss.

### 3.   THE $2,300,949.19 EXPERT AUTO CLAIMS ESTIMATE IS THE ACTUAL CASH VALUE OF BSM'S LOSS

Kansas' Supreme Court has recognized "that the term 'actual cash value,' when applied to a partial loss under the insurance policy and facts in this case, means the cost to repair without any reduction for depreciation." *Thomas v. American Fam. Ins. Co.*, 666 P.2d 676, 679 (Kan. 1983). "The actual cash value is an *estimate* of the needed repairs; the determination of actual cash value is not based upon what the insured actually pays to repair or replace the damaged property." *Tritschler v. Allstate Ins. Co.*, 144 P.3d 519, 529 ¶ 27 (Ct. App. Ariz. 2006) (emphasis in original) ("[A]ctual cash value in adjusting a property loss includes any cost that an insured would be reasonably likely to incur in repairing or replacing a covered loss, regardless of whether the insured intends to repair or replace the property") (citing to *Salesin v. State Farm Fire & Cas. Co.*, 581 N.W. 2d 781, 791 (Ct. App. Mich. 1998)).

Thus, "the calculation of the actual cash value of the loss does not require actual repair or replacement of the damaged property." *Ostendorf v. Grange Indem. Ins. Co.*, 2020 WL 134169, *2 (6th Cir. Jan. 13, 2020) ("[E]ven if [the policyholder] chooses not to repair its property at all, it would still be entitled to what it bargained for: the actual cash value of its loss") (*appeal pending*). That estimate was already made by Expert Auto, and confirmed by USA Dent, BSM, and Landmark, immediately after the loss. [SOF, ¶¶ 19, 22-26, 89-91]. Landmark has never offered any other estimate or made any argument against the Expert Auto Claims estimate. [*Id.*, ¶ 27].

IV.   **THE PARTIES' APPRAISERS HAVE AGREED UPON THE AMOUNT OWING**

As an additional basis for judgment in BSM's favor, the Policy provides that "[i]f the Insured and the Company fail to agree as to the amount of loss, either may . . . demand an appraisal of the loss, In (sic) such event the Insured and the Company shall each select a competent Appraiser and the Appraiser shall select a competent and disinterested Umpire. The Appraisers shall state separately the Actual Cash Value and the amount of loss and *falling (sic) to agree* shall submit their differences to the Umpire. *Agreement in writing of any two shall determine the amount of loss.*" [*Id.*, ¶ 122 at § IX(6) (emphasis added)]. Both Landmark and BSM selected competent appraisers to be involved in the appraisal of BSM's loss. [*Id.*, ¶¶ 12-13]. Expert Auto Claims prepared a written appraisal of the loss, conferring with USA Dent, and both agreed upon Expert Auto Claims' adjustment amount of $2,300,949.19. [*Id.*, ¶¶ 19, 89-91]. This alone is determinative of BSM's claim for breach of contract.

V.   **ALTHOUGH BSM DID REPAIR THE VEHICLES, WHETHER IT REPAIRED THE VEHICLES AND HOW MUCH IT PAID IS IRRELEVANT**

Courts have routinely recognized that whether repairs are made, and the actual cost of repairs, is irrelevant to a policyholder's claim. For example, as one court explained:

> [T]he actual roofing and siding installed by Anika is irrelevant to its ACV claim. As explained above, an ACV claim requires calculating replacement cost for like quality and kind materials, and subtracting from that value the depreciation amount. . . . Because Anika did not seek coverage based on the RCV loss, which is presumably higher than the ACV loss, the actual amount it paid for the roof is not relevant to its claim. It would only become relevant if Anika made a RCV claim. Thus, Hartford's claim does not have any merit and does not create a genuine issue of material fact." *Anika & Assoc., Inc. v. Hartford Cas. Ins. Co.*, 2013 WL 1499532, *8 (E.D. Mich. Apr. 10, 2013)

79557338.1

Kansas and other jurisdictions have reached similar conclusions. *See, e.g., Burchett v. Kansas Mut. Ins. Co.*, 48 P.3d 1290, 1291-92 (Kans. App. 2002) ("If the insured does not repair or replace the damaged property, he or she is only entitled to actual cash value"); *200 South Broad Street, Inc. v. Allstate Ins. Co.*, 2009 WL 2028349, *2 (E.D. La. July 9, 2009) ("Considering that cash value is all that is called for under these circumstances under the policy, repair costs are irrelevant to this issue"); *Lafollette v. Liberty Mut. Fire Ins. Co.*, 2017 WL 1026424, *9 (W.D. Mo. Mar. 16, 2017) ("The amount the [policyholder] actually spent to repair the damage is wholly irrelevant to whether they were injured. This is because . . . the ACV payment belongs to the insured [and] does not need to be used for repairs"); *Riggins v. American Fam. Mut. Ins. Co.*, 217 S. Supp. 3d 1017, 1022 (W.D. Mo. Nov. 17, 2016) ("[S]ubsequent cost to repair or replace does not change an insured's entitlement to full ACV"); *Tritschler v. Allstate Ins. Co.*, 144 P.3d 519, 526 ¶ 15 (Ct. App. Ariz. 2006) ("[A]n insured is entitled to receive the actual cash value of the damage [] regardless of whether he or she chooses to repair or replace the damaged property").

Here, the undisputed evidence shows that USA Dent spent months and numerous contractors repairing all of BSM's vehicles damaged from the May 5, 2019 storm. [SOF, ¶¶ 81-83]. BSM and USA Dent reached an agreement that USA Dent would receive a percentage of the insurance proceeds for those repairs. [*Id.*, ¶¶ 137-140]. BSM made a $150,000 payment to help cover some of the repair workers, but USA Dent and many of its contractors remain overwhelmingly unpaid. [*Id.*, ¶ 28]. Landmark has no legal basis to deny payment simply because USA Dent did not charge BSM a specific dollar figure for its uncontroverted work.

## VI.   BSM IS ENTITLED TO ITS ATTORNEYS' FEES

Landmark has not offered any payments whatsoever on BSM's loss that it suffered 2 1/2 years ago, despite having received the Expert Auto Appraisal over 27 months ago. Accordingly, for the reasons set forth above, BSM is entitled to its attorney fees in addition to a judgment of $2,300,949.19 and interest. *See* K.S.A. § 40-908 (providing for attorney fees in all actions "in which judgment is rendered against any insurance company on any policy given to insure any property in this state against loss by fire, tornado, lightning or hail"). The Policy issued by Landmark is the type included in K.S.A. § 40-908, as it specifically provides coverage for hail, and BSM in fact suffered hail damage to its vehicles. [SOF, ¶¶ 6-8, 136, 141-142]. BSM respectfully requests the opportunity to provide the Court with a declaration with regard to its attorneys' fees.

## <u>CONCLUSION</u>

BSM undeniably suffered a large loss over two years ago as a result of a storm on May 5, 2019. It immediately tendered the claim to Landmark, which sent out appraisers to adjust the loss and to determine the loss payable under the Policy. Landmark's appraisers determined that amount to be $2,300,949.19. There is no just cause to continue depriving BSM of this payment, under a policy for which it paid nearly $1.5 million in premiums. Accordingly, BSM respectfully requests summary judgment in its favor in the amount of $2,300,949.19, in addition to pre- and post-judgment interest, attorney fees and costs.

79557338.1

Respectfully submitted,

POLSINELLI PC

*/s/ Brendan L. McPherson*
Brendan L. McPherson # 23771
900 W. 48th Place, Suite 900
Kansas City, Missouri 64112
Telephone:  (816) 753-1000
Facsimile:   (816) 753-1536
bmcpherson@polsinelli.com


CARLYLE W. HALL III (pro hac vice)
JONATHAN G. BRINSON (pro hac vice)
CityScape, One E. Washington St., Ste. 1200
Phoenix, AZ 85004
Telephone: (602) 650-2000
Facsimile: (602) 264-7033
chall@polsinelli.com
jbrinson@polsinelli.com

ATTORNEYS FOR PLAINTIFF BRANDON
STEVEN MOTORS, LLC

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the foregoing has been emailed and mailed to Landmark's counsel on the 1st day of October, 2021.

*/s/ Brendan L. McPherson*

**Attorney for Plaintiff Brandon Steven Motors, LLC**

79557338.1