IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BRANDON STEVEN MOTORS, LLC,

    Plaintiff,

    v.

LANDMARK AMERICAN
INSURANCE COMPANY,

    Defendant.

Case No. 2:19-cv-02659-HLT-GEB

## MEMORANDUM AND ORDER

This breach-of-contract case centers on whether payment is owed to an insured under an insurance policy. Plaintiff Brandon Steven Motors ("BSM") operates a car dealership that was hit by a hailstorm. BSM sought payment under its insurance policy issued by Defendant Landmark American Insurance Company. The relationship between the parties eventually broke down and BSM filed this case. BSM brings claims for breach of contract and breach of good faith and fair dealing. BSM moves for partial summary judgment on its breach-of-contract claim even though discovery is ongoing. Doc. 171. Because BSM has not met its burden of showing any policy provision that mandates payment in the amount it seeks, the Court denies the motion.

**I.    BACKGROUND[1]**

BSM owns car dealerships in Wichita, Kansas. BSM purchased an insurance policy from Landmark that covered damage to vehicles on the dealership lot caused by hailstorms. The policy has a limit of $2.5 million. The policy includes the following provisions:

---

[1] The Court considers the following undisputed facts in accordance with Federal Rule of Civil Procedure 56. The Court notes some of the stated facts very nearly mischaracterize the cited evidence or cite to evidence not provided. The parties have also muddied the facts with legal arguments that often fail to meet the substance of the fact asserted. These unacceptable practices have made resolution of this motion more complicated than it needed to be.

**IX. CLAIMS REPORTING AND ADJUSTMENT:**

. . .

3. PROOF OR LOSS. Within sixty (60) days after loss or damage, unless such time Is [sic] extended In [sic] writing by the Company, the Insured shall forward the Company a statement, signed and sworn to by the insured, stating the place, time and cause of the loss or damage, the interest of the Insured and of all others in the property, the sound value thereof and the amount of loss or damage thereto, all encumbrances thereon and all insurance, whether valid and collectible or not, covering the said property. The Insured, as often as required, shall submit to examination under oath by the person designated by the Company and subscribe the same. As often as required, the Insured shall produce for examination all books of accounts. [sic] bills, invoices and other vouchers or certified copies thereof, if the originals are lost, at such reasonable place as may be designated by the Company and shall, permit extracts and copies thereof to be made, - [sic] The Company shall also be permitted to Inspect the Insured's premises and units.

4. PAYMENT OF LOSS. The Company at it's [sic] sole option may pay for the loss in money or may repair or replace the damaged or stolen unit or part thereof but if requested by the Company, the Insured shall replace such unit or part thereof or furnish the labor and materials necessary for repairs thereto and the Company shall pay only the actual cost to the insured. The Company may, at any time before the loss is paid or the unit Is [sic] so replaced, at their expense return any stolen unit to the Insured, with payment for any resultant damage thereto to or may take all or part of the damaged or stolen unit at the agreed or appraised value but there shall be no abandonment to the Company.

   The loss shall not become payable unless, as a condition precedent to liability, there shall have been full compliance with all the terms and conditions of this policy and in any event payment shall not be made until thirty (30) days after verified proof of loss shall have been received by the Company and if an appraisal is demanded then not until thirty (30) days after an award has been made by the appraiser.

. . .

    6. APPRAISAL. If the Insured and the Company fail to agree as to the amount of loss, either may, within sixty (60) days after proof of loss is flied [sic], demand an appraisal of the loss, In [sic] such event the Insured and the Company shall each select a competent Appraiser and the Appraiser shall select a competent and disinterested Umpire. The Appraisers shall state separately the Actual Cash Value and the amount of loss and falling [sic] to agree shall submit their differences to the Umpire. Agreement in writing of any two shall determine []the amount of loss. . . .

. . .

**X Basis of Loss Settlement and Adjustment:**

    **A.** In the event of a partial "loss" to any "automobile" insured hereunder which is not settled on an appearance damage basis, "We" will calculate settlement as follows:

    Labor rates will be calculated as ninety percent (90 %) of participating dealer's customary insurance labor rates. Parts, paint and any other materials will be calculated at seventy-five percent (75[] %) of participating dealer's customary retail cost. If the participating dealer subcontracts all or part of the repairs to a repair facility in which they, their officers, shareholders or employees have no financial interest, "We" will make settlement at the cost to the participating dealer, subject to this rate being approved by "Us".

    **B.** In the event of "loss" to a covered "automobile"

        **1.** "We" may, at "Our" option:

            a) Pay for, repair or replace a damaged or stolen "automobile"; or

            b) Return "automobiles" which are stolen, at "Our" expense, and pay for the repair cost to the "automobile"; or

            c) Take all or any part of the damaged or stolen "automobile" at an agreed or appraised value;

        **2.** "We" may elect to adjust the "loss" with the participating dealer.

. . .

    **D.** The "Insured" agrees to use paintless dent repair procedures where legally permitted. If repairs are not completed using paintless dent repair procedures, where legally permitted, "We" will not pay more than the amount that would have been incurred for necessary expenses using this method of repair.

Doc. 27-1 at 19-22. "Appearance damage basis" as used in section X.A. is where both sides agree on the value of the damage.

Several hundred vehicles on BSM's lot were damaged following a storm on May 5, 2019. BSM reported the loss to Landmark the next day and provided an inventory listing of the vehicles on its lot. BSM did not provide any dollar amount for the loss.

Landmark retained Expert Auto Claims as the adjuster to visually inspect the vehicles, determine the cause and scope of the damage, take photos, write estimates, and assist the insured with the process. Expert Auto Claims spent several days at the lot inspecting the damaged vehicles along with representatives from USA Dent, a company retained by BSM to evaluate the damage, assist with the claim process, and perform repairs. BSM and USA Dent agreed that USA Dent's compensation would be a percentage (between 40-60%) of any amount paid by Landmark to BSM and would not be the actual cost of the repairs.

An Expert Auto Claims employee, James Clark, put together the team that inspected the vehicles. Clark visited the lot on May 9-10, 2019. Clark expected to find straight-line wind damage. But he found it suspicious that the vehicles were scratched on all sides. Clark observed 5-6 vehicles on the lot that looked as if they did not have wind damage on their sides. But during an inspection several hours later, Clark observed damage on the sides of those vehicles that he had not seen previously. Expert Auto Claims told Landmark about Clark's observations. Clark was told to proceed with documenting the damages as presented. Clark did not take photos of the 5-6 vehicles, cannot identify them now, did not see anyone around those vehicles, did not report the

issue to BSM, and did not stop any repair work on those vehicles. Clark did not have any direct communication with BSM about this issue.

Landmark subsequently retained G4S to conduct a limited investigation into whether the damage was legitimate wind damage. G4S completed the investigation on June 17, 2019, and prepared a report. G4S's report made some suggestions for additional investigation and stated that an insurance fraud referral to the state was not warranted. Landmark rejected G4S's suggestions for additional investigation. G4S's investigation took 4.1 hours.

On June 24, 2019, Expert Auto Claims sent Landmark a spreadsheet regarding BSM's claimed loss. The spreadsheet detailed the vehicles on BSM's lot and listed the claim total for each vehicle and the amount after consideration of the deductible and loss from an earlier storm. Doc. 29-8 at 5-12. The total amount in the spreadsheet is $2,300,949.19.

It doesn't appear that the parties dispute the actual calculations in the spreadsheet, but they do dispute their significance. BSM characterizes it as an appraisal representing the amount it is owed—$2,300,949.19. Landmark characterizes it as a spreadsheet containing an estimate of the cost to repair the damaged vehicles as claimed by USA Dent on behalf of BSM, not the actual cost of repair as the policy requires. It is undisputed that the spreadsheet does not reflect the actual cost to BSM for the vehicle repairs performed by USA Dent. USA Dent ultimately did repair all the vehicles damaged in the storm. But BSM does not have any record of the actual repairs that USA Dent made. And USA Dent did not document the actual repairs it performed.

When Expert Auto Claims sent the spreadsheet to Landmark, Landmark told Expert Auto Claims that it "may share [the spreadsheet] with the insured to see if they agree." Doc. 171-26 at 5. Expert Auto Claims then forwarded the spreadsheet to BSM, stating:

> Please see the attached spreadsheet for your review. This store was involved in a loss in February and a loss in May. For the units that

5

> were involved in both losses we deducted the loss paid in the February loss from the appraised May 5, 2019 loss. I did not have any information that you repaired any of these units or replaced any parts, but if you have and can provide that information to your insurance carrier they will take that into consideration.

*Id.* at 4. BSM then asked what the next step was in getting the claim paid. *Id.* The Landmark representative responded, "Are you in agreement to the latest spreadsheet.? [sic] I need one more item from [Expert Auto Claims] that they said I should have by Friday." *Id.* at 3. BSM's representative replied, "Yes sir, the numbers are acceptable." *Id.*

BSM followed up a few days later and asked whether payment would occur soon. Landmark responded in the negative and stated that the "investigation continues." Doc. 171-30 at 5. The parties further discussed that Landmark was seeking additional information delineating between the wind and hail damage. BSM continued to ask when it could expect payment. Landmark's representative responded that he could not say until the investigation was over.

On July 3, 2019, Landmark sent a reservation-of-rights letter questioning whether the claimed damages were caused by a covered loss, in part because it was not clear to Landmark that wind speeds had reached sufficient velocity to damage the vehicles. Doc. 29-11 at 6. Landmark also questioned whether BSM had "misrepresented or concealed material facts." *Id.*

On July 18, 2019, Landmark informed BSM that it had retained G4S to do some "preliminary research" on the dealership location and wind speeds. On July 30, 2019, Landmark notified BSM that it retained counsel and would be putting together a document request. On August 14, 2019, Landmark's counsel sent a sent a letter requesting 11 categories of documents, a sworn statement of loss as provided for in the policy, and an examination under oath. Doc. 27-3.

6

One of the document requests sought "invoices, receipts, proposals, estimates or other documents reflecting any actual repairs of the claimed damages to the vehicles as a result of hail and/or wind on May 5, 2019." *Id.* at 4. BSM responded to this request by stating:

> Request No. 7 fails to recognize that the policy provides coverage for Actual Cash Value and is not based upon the actual repairs. Regardless, BSM had an oral agreement with USA Dent to make the repairs based upon the spreadsheet created by Expert Auto that Landmark has had in its possession since June.

Doc. 27-6 at 4. BSM did not produce any invoices for work done by USA Dent. BSM did not have any invoices because its agreement with USA Dent did not call for invoices.

BSM filed this case on October 25, 2019, because the parties were unable to resolve the matter. Doc. 1. BSM asserts one count of breach of contract and one count of breach of duty of good faith and fair dealing. Doc. 27 at 8 (amended complaint).[2]

## II.   STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In applying this standard, courts view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a 'reasonable jury could return a

---

[2] Shortly after BSM filed an amended complaint and Landmark answered, BSM moved for summary judgment on its breach-of-contract claim, raising essentially the same arguments made in the instant motion. Doc. 29 at 23; Doc. 48 at 6. In response, Landmark sought leave to conduct discovery under Rule 56(d). Doc. 36. The then-assigned district judge granted Landmark's motion and denied BSM's motion without prejudice. Doc. 48 at 8-9. This case was subsequently reassigned to the undersigned. Doc. 92.

7

verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III. ANALYSIS

BSM seeks partial summary judgment on its breach-of-contract claim. BSM's motion does not discuss the elements of a breach-of-contract claim. BSM instead generally argues that the policy covered the loss and that it is entitled to recover $2,300,949.19—the total amount in the spreadsheet, which represents the estimated cost of repair. Landmark counters that the policy pays based on the actual cost to BSM to repair the vehicles and that BSM has not provided this information. Thus, the primary issue in this motion is whether BSM has established that Landmark breached the insurance policy by not paying it the amount in the spreadsheet.

Under Kansas law, a breach-of-contract claim requires a showing of the following elements: "(1) the existence of a contract between the parties; (2) consideration; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) [the] defendant's breach of the contract; and (5) that [the] plaintiff was damaged by the breach." *Ice Corp. v. Hamilton Sundstrand Inc.*, 444 F. Supp. 2d 1165, 1169 (D. Kan. 2006). Insurance policies are contracts in Kansas, and their interpretation is a question of law. *BancInsure, Inc. v. F.D.I.C.*, 796 F.3d 1226, 1233 (10th Cir. 2015). Courts should "consider the policy as a whole, rather than viewing provisions in isolation." *Id*. Where the language is unambiguous, a court should enforce the contract as made. *Id.* Likewise, unambiguous language should be "construed in its plain, ordinary, and popular sense and according to the sense and meaning of the terms used." *Graves v. Am. Family Mut. Ins. Co.*, 686 F. App'x 536, 538 (10th Cir. 2017) (internal quotation and citation omitted).

### A. Actual Cash Value Versus Actual Cost to Repair

The first issue is whether BSM has established that the policy pays the spreadsheet total. BSM's primary argument is that the policy pays out on an "actual cash value" basis, which BSM claims is measured by the estimated cost of repair (i.e., the spreadsheet total), not the actual cost of repair. *See* Doc. 171 at 45-49. In arguing that the policy pays out based on "actual cash value," BSM argues that Landmark has made payments under the same policy to BSM affiliates with the notation "ACV" and that some of the quotes provided to BSM when it was purchasing the policy state that the "valuation" of the policy is "actual cash value." *See, e.g.*, Doc. 171-47 through Doc. 171-50.[3] Landmark does not dispute these facts. Doc. 171 at 32; Doc. 179 at 20. But it argues that BSM misunderstands the definition of "actual cash value," which must be considered in light of the policy language.

The Kansas Supreme Court has held that "the term 'actual cash value,' when applied to a partial loss under the insurance policy and facts in this case, <u>means the cost to repair</u> without any reduction for depreciation." *Thomas v. Am. Fam. Mut. Ins. Co.*, 666 P.2d 676, 679 (Kan. 1983) (emphasis added). *Thomas* does not clarify whether the proper measure is the estimated cost of repair or the actual cost of repair. BSM argues that "actual cash value" is measured by the estimated cost to repair. But Landmark points to language in the policy that suggests it is the actual cost of repair that matters here.

Landmark specifically points to the "PAYMENT OF LOSS" provision, which states:

> The Company at it's [sic] sole option may pay for the loss in money or may repair or replace the damaged or stolen unit or part thereof but if requested by the Company, the Insured shall replace such unit

---

[3] BSM also points to the policy's "APPRAISAL" paragraph, which states that the parties may elect to appoint their own appraiser, who "shall state separately the Actual Cash Value and the amount of loss and falling [sic] to agree shall submit their differences to the Umpire." Doc. 27-1 at 20. But the fact that the appraisal provision refers to "actual cash value"—the only place the policy uses this phrase—seems unhelpful because BSM admits that the parties never invoked the appraisal provision. Doc. 197 at 20-21; *see also id.* at 23 n.1.

9

> or part thereof or furnish the labor and materials necessary for repairs thereto and the Company <u>shall pay only the actual cost to the insured</u>.

Doc. 27-1 at 20 (emphasis added). Landmark contends that this provision, read in concert with *Thomas*, means that any payout under the policy is the <u>actual</u> cost of repair (evidence of which BSM has not provided) and not the estimated cost of repair (the spreadsheet total).

BSM initially responds that the "actual cost to the insured" provision has not been invoked because BSM itself did not make the repairs—USA Dent did. Doc. 197 at 15. This argument seems specious. The "actual cost to the insured" provision does not explicitly require BSM itself to do the work. It just says that "the Insured shall replace such unit or part thereof <u>or</u> furnish the labor and materials necessary for repairs thereto." Doc. 27-1 at 20 (emphasis added). It is undisputed that BSM hired USA Dent to repair the vehicles and that USA Dent performed the repairs.

BSM also contends that Landmark never "requested" that BSM repair the vehicles. Doc. 197 at 16. But the testimony cited states that Landmark didn't "request" that BSM replace or repair the vehicles because BSM advised Landmark in writing that it repaired every vehicle. *See* Doc. 171-19 at 40-41. BSM's action to repair the vehicles would seem to deprive Landmark of the ability to make such a request. Under these facts, the Court cannot conclude "as a matter of law," as BSM urges, Doc. 197 at 15, that the "actual cost to the insured" language does not apply. Further, even if the "actual cost to the insured" provision didn't apply, BSM would still not be entitled to summary judgment because it has not pointed to any applicable policy language that demonstrates it is entitled to the spreadsheet total, as discussed throughout.[4]

---

[4] Neither party meaningfully addresses Landmark's option to "pay for the loss in money" under the "PAYMENT OF LOSS" section of the policy, or what that means.

10

None of the cases cited by BSM direct this Court to a different result, as those cases either had specific policy language that made the actual cost of repair irrelevant or actual repairs did not occur—neither of which is the case here. *See, e.g.*, *Anika & Assocs., Inc. v. Hartford Cas. Ins. Co.*, 2013 WL 1499532, at *8 (E.D. Mich. 2013) (stating that "the actual amount it paid . . . is not relevant to [the] claim" where the insured did not seek coverage based on replacement cost); *Burchett v. Kan. Mut. Ins. Co.*, 48 P.3d 1290, 1291-92 (Kan. Ct. App. 2002) ("If the insured <u>does not repair or replace the damaged property</u>, he or she is only entitled to actual cash value." (emphasis added)). Similarly, cases cited by BSM that suggest that "actual cash value" is measured by the estimated cost of repair, *see* Doc. 171 at 47, can't circumvent the policy's own language that unambiguously provides for payment of "the actual cost to the insured."

### B.      Agreement to Spreadsheet Total

Alternatively, BSM argues that Landmark agreed to the spreadsheet total and should be made to pay that amount. *Id.* at 43-44. But there was no agreement that the amount in the spreadsheet would be paid. Rather, the "agreement" regarding the spreadsheet was only in the form of an email from a Landmark representative asking whether BSM was in agreement with the spreadsheet, and BSM's response that the "numbers" were acceptable. Although there seems to be no dispute between the parties about the numbers in the spreadsheet (at least for purposes of the instant motion), the key dispute in the case is whether payment in that amount is owed under the policy. And as discussed above, BSM has not identified any policy language that obligates Landmark to pay the amount in the spreadsheet.

Equally unpersuasive is BSM's related contention that the spreadsheet total represents an amount agreed on by the parties' appraisers and that the policy requires payment of this amount. Again, BSM concedes that the appraisal provision was not invoked by either party. Doc. 197 at

11

20-21; *see also id.* at 23 n.1. Nor is it clear that USA Dent, who helped draft the spreadsheet, was serving as BSM's appraiser.

BSM also contends that the spreadsheet total is the "appearance damage basis" provided for in the policy. Doc. 171 at 44-45. This is based on a policy provision that explains how a settlement will be calculated for any partial loss "not settled on an appearance damage basis." Doc. 27-1 at 22. The parties agree that "appearance damage basis" is where both parties agree on the value of the damage. BSM argues the spreadsheet total is therefore the appearance damage basis and must be paid. But again, the parties have not agreed to the significance of the spreadsheet total. Thus, while the policy allows the parties to reach agreement, they have not done so.

### C. Other Arguments

The parties both make other arguments. BSM contends that Landmark cannot deny its claim for payment based on the fraud investigation. Landmark contends that BSM has not met conditions precedent for payment under the policy, including by providing a sworn statement of loss. The parties also debate the significance of BSM's arrangement with USA Dent. The Court does not reach these arguments because BSM has not met its initial burden of showing that it is entitled to payment under the policy in the amount it seeks.

Further, BSM argues that Landmark is estopped from disputing the spreadsheet amount. Doc. 197 at 22-25. But this argument was raised for the first time in BSM's reply, which is not proper. Accordingly, BSM's motion for partial summary judgment must be denied.

**IV.     CONCLUSION**

THE COURT THEREFORE ORDERS that BSM's Renewed Motion for Summary Judgment (Doc. 171) is DENIED WITH PREJUDICE.

IT IS SO ORDERED.

Dated: January 24, 2022         /s/ *Holly L. Teeter*
                                                  HOLLY L. TEETER
                                                  UNITED STATES DISTRICT JUDGE