# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **BRANDON STEVEN MOTORS, LLC,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 2:19-cv-02659-HLT** |
| **LANDMARK AMERICAN INSURANCE COMPANY,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

This breach-of-contract case centers on whether payment for the estimated cost of repairs is owed to an insured under an insurance policy. Plaintiff Brandon Steven Motors ("BSM") operates a car dealership that was hit by a hailstorm and contends that Defendant Landmark American Insurance Company has breached its obligations under its insurance policy.

BSM previously moved for partial summary judgment on its breach-of-contract claim, but the Court denied that motion. Doc. 203. Now Landmark moves for summary judgment on both claims. Doc. 210. This case ultimately comes down to the interpretation of the insurance policy—a question of law. Because the policy does not provide for payment based on the estimated cost of repairs when repairs were completed, the Court grants summary judgment to Landmark on both claims.

## I.      BACKGROUND

BSM previously moved for summary judgment. *See* Doc. 171. In ruling on that motion, the Court discerned the undisputed facts. *See* Doc. 203 at 1-7. The parties retread the same factual ground for the most part in the current briefing. Landmark provides 22 facts in its motion. BSM responds with an additional 164 facts, most of which are verbatim facts asserted by BSM in its

earlier motion. The Court thus draws largely on its earlier finding of undisputed facts, except to the extent those facts are no longer relevant, and will supplement where new facts have been provided by the parties.

BSM owns car dealerships in Wichita, Kansas. BSM purchased an insurance policy from Landmark that covered damage to vehicles on the dealership lot caused by hailstorms. The policy has a limit of $2.5 million. The policy includes the following provisions:

### IX. CLAIMS REPORTING AND ADJUSTMENT:

. . .

3. PROOF OR LOSS. Within sixty (60) days after loss or damage, unless such time Is [sic] extended In [sic] writing by the Company, the Insured shall forward the Company a statement, signed and sworn to by the insured, stating the place, time and cause of the loss or damage, the interest of the Insured and of all others in the property, the sound value thereof and the amount of loss or damage thereto, all encumbrances thereon and all insurance, whether valid and collectible or not, covering the said property. The Insured, as often as required, shall submit to examination under oath by the person designated by the Company and subscribe the same. As often as required, the Insured shall produce for examination all books of accounts. [sic] bills, invoices and other vouchers or certified copies thereof, if the originals are lost, at such reasonable place as may be designated by the Company and shall, permit extracts and copies thereof to be made, - [sic] The Company shall also be permitted to Inspect the Insured's premises and units.

4. PAYMENT OF LOSS. The Company at it's [sic] sole option may pay for the loss in money or may repair or replace the damaged or stolen unit or part thereof but if requested by the Company, the Insured shall replace such unit or part thereof or furnish the labor and materials necessary for repairs thereto and the Company shall pay only the actual cost to the insured. The Company may, at any time before the loss is paid or the unit Is [sic] so replaced, at their expense return any stolen unit to the Insured, with payment for any resultant damage thereto to or may take all or part of the damaged or stolen unit at the agreed or appraised value but there shall be no abandonment to the Company.

The loss shall not become payable unless, as a condition precedent to liability, there shall have been full compliance with all the terms and conditions of this policy and in any event payment shall not be made until thirty (30) days after verified proof of loss shall have been received by the Company and if an appraisal is demanded then not until thirty (30) days after an award has been made by the appraiser.

. . .

6.  APPRAISAL. If the Insured and the Company fail to agree as to the amount of loss, either may, within sixty (60) days after proof of loss is flied [sic], demand an appraisal of the loss, In [sic] such event the Insured and the Company shall each select a competent Appraiser and the Appraiser shall select a competent and disinterested Umpire. The Appraisers shall state separately the Actual Cash Value and the amount of loss and falling [sic] to agree shall submit their differences to the Umpire. Agreement in writing of any two shall determine []the amount of loss. . . .

. . .

11.  No suit may be commenced against the Company under this Policy unless the insured has first complied with all terms and conditions of this Policy unless such suit shall have been instituted within one year after the happening of the occurrence which give rise to such claim.

## X  Basis of Loss Settlement and Adjustment:

**A.**  In the event of a partial "loss" to any "automobile" insured hereunder which is not settled on an appearance damage basis, "We" will calculate settlement as follows:

Labor rates will be calculated as ninety percent (90 %) of participating dealer's customary insurance labor rates. Parts, paint and any other materials will be calculated at seventy-five percent (75[] %) of participating dealer's customary retail cost. If the participating dealer subcontracts all or part of the repairs to a repair facility in which they, their officers, shareholders or employees have no financial interest, "We" will make settlement at the cost to the participating dealer, subject to this rate being approved by "Us".

**B.**  In the event of "loss" to a covered "automobile"

    **1.** "We" may, at "Our" option:

        a) Pay for, repair or replace a damaged or stolen "automobile"; or

        b) Return "automobiles" which are stolen, at "Our" expense, and pay for the repair cost to the "automobile"; or

        c) Take all or any part of the damaged or stolen "automobile" at an agreed or appraised value;

    **2.** "We" may elect to adjust the "loss" with the participating dealer.

. . .

    **D.** The "Insured" agrees to use paintless dent repair procedures where legally permitted. If repairs are not completed using paintless dent repair procedures, where legally permitted, "We" will not pay more than the amount that would have been incurred for necessary expenses using this method of repair.

Doc. 1-1 at 19-22. "Appearance damage basis" as used in Section X.A. is where both sides agree on the value of the damage.

Several hundred vehicles on BSM's lot were damaged in a storm on May 5, 2019. BSM reported the loss to Landmark the next day and provided an inventory listing of the vehicles on its lot. BSM did not provide any dollar amount for the loss.

Landmark retained Expert Auto Claims as the adjuster to visually inspect the vehicles, determine the cause and scope of the damage, take photos, write estimates, and assist the insured with the process. Expert Auto spent several days at the lot inspecting the damaged vehicles along with representatives from USA Dent, a company retained by BSM to evaluate the damage, assist with the claim process, and perform repairs. BSM and USA Dent agreed that USA Dent's compensation would be a percentage (between 40-60%) of any amount paid by Landmark to BSM.

On June 24, 2019, Expert Auto sent Landmark a spreadsheet regarding BSM's claimed loss. The spreadsheet detailed the vehicles on BSM's lot and listed the claim total for each vehicle minus the deductible and loss from an earlier storm. Doc. 29-8 at 5-12. The spreadsheet total is $2,300,949.19.

The parties don't dispute the actual calculations in the spreadsheet, but they do dispute the spreadsheet's significance. BSM characterizes it as an appraisal representing the amount it is owed by Landmark—$2,300,949.19. Landmark characterizes the spreadsheet as an estimate of the cost to repair the damaged vehicles, but not the actual cost of repair. It is undisputed that the spreadsheet does not reflect the actual cost to BSM for the vehicle repairs performed by USA Dent.

When Expert Auto sent the spreadsheet to Landmark, Landmark told Expert Auto that it "may share [the spreadsheet] with the insured to see if they agree." Doc. 171-26 at 5. Expert Auto then forwarded the spreadsheet to BSM, stating:

> Please see the attached spreadsheet for your review. This store was involved in a loss in February and a loss in May. For the units that were involved in both losses we deducted the loss paid in the February loss from the appraised May 5, 2019 loss. I did not have any information that you repaired any of these units or replaced any parts, but if you have and can provide that information to your insurance carrier they will take that into consideration.

*Id.* at 4. BSM then asked what the next step was in getting the claim paid. *Id.* Landmark's representative responded, "Are you in agreement to the latest spreadsheet.? [sic] I need one more item from Expert Auto that they said I should have by Friday." *Id.* at 3. BSM's representative replied, "Yes sir, the numbers are acceptable." *Id.*

BSM followed up a few days later and asked whether payment would occur soon. Landmark responded in the negative and stated that the "investigation continues." Doc. 171-30 at 5. Landmark was seeking additional information delineating between the wind and hail damage.

BSM continued to ask when it could expect payment. Landmark's representative responded that he could not say until the investigation was over.

On July 3, 2019, Landmark sent a reservation-of-rights letter questioning whether the claimed damages were caused by a covered loss, in part because it was not clear to Landmark that wind speeds had reached sufficient velocity to damage the vehicles. Doc. 29-11 at 6. Landmark also questioned whether BSM had "misrepresented or concealed material facts." *Id.*[1]

On July 30, 2019, Landmark notified BSM that it retained counsel and would be putting together a document request. On August 14, 2019, Landmark's counsel sent a sent a letter requesting 11 categories of documents, a sworn statement of loss as provided for in the policy, and an examination under oath. Doc. 27-3.

One of the document requests sought "invoices, receipts, proposals, estimates or other documents reflecting any actual repairs of the claimed damages to the vehicles as a result of hail and/or wind on May 5, 2019." *Id.* at 4. BSM responded to this request by stating:

> Request No. 7 fails to recognize that the policy provides coverage for Actual Cash Value and is not based upon the actual repairs. Regardless, BSM had an oral agreement with USA Dent to make the repairs based upon the spreadsheet created by Expert Auto that Landmark has had in its possession since June.

Doc. 27-6 at 4. BSM did not produce any invoices for work done by USA Dent in response to this request.

BSM has stated both that "all" vehicles were repaired by USA Dent and that USA Dent performed "some" vehicle repairs. *Compare* Doc. 235 at 8 (BSM's response to DSOF 12 stating that "[i]t is undisputed that thereafter, USA Dent performed some repairs to the vehicles damaged

---

[1]   After an Expert Auto representative raised some concerns about the nature of the damage, Landmark hired a company to investigate the issue, which ultimately concluded that an insurance fraud referral to state authorities was not warranted. Doc. 203 at 4-5. Landmark does not rely on this fraud investigation to deny coverage.

in the storm . . . .") *with id.* at 21 (PSOF 73 stating that "[e]very witness with first-hand knowledge testified that all of the vehicles had been repaired"). Regardless of the extent of the repairs made, however, it is undisputed that BSM does not have any record of the actual repairs that USA Dent made. USA Dent did not document the actual repairs it performed.

USA Dent eventually created some invoices from a "mess of a wad of papers" that "had VIN numbers and had dollar amounts" along with "[l]ittle marks or hash marks" and "random gibberish." Doc. 235-2 at 4, 7. The record regarding these invoices is not clear. But it appears they were created after BSM's dispute with Landmark arose. A representative of USA Dent testified that the "invoices go back to basically trying to get within a number that was close to what the spreadsheet was sent to them by the insurance company." Doc. 216-1 at 139. A representative of USA Dent testified these invoices were not estimates but were "billing" amounts. Although BSM frequently insists in its response brief that the invoices were "billing" amounts, BSM's prior reply in support of its motion for summary judgment denied this, stating that "BSM disagrees that the USA Dent invoice was a 'billing amount,' . . . . BSM was never billed for the invoice created by USA Dent." Doc. 197 at 7. Regardless, the invoices do not reflect the actual repairs completed by USA Dent, and neither party advocates that the invoices are a measure of payment owed under the policy.

BSM filed this case on October 25, 2019. Doc. 1. BSM asserts one count of breach of contract and one count of breach of the duty of good faith and fair dealing. Doc. 27 at 8 (amended complaint).

## II.   STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party

bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In applying this standard, courts view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a 'reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Where the non-moving party carries the burden of proof at trial, the moving party may point to an absence of evidence to support the non-movant's case. *See Celotex Corp.*, 477 U.S. at 325.

## III.    ANALYSIS

### A.    Breach of Contract

BSM's first claim is for breach of contract, the elements of which are: "(1) the existence of a contract between the parties; (2) consideration; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) [the] defendant's breach of the contract; and (5) that [the] plaintiff was damaged by the breach." *Ice Corp. v. Hamilton Sundstrand Inc.*, 444 F. Supp. 2d 1165, 1169 (D. Kan. 2006).

Despite the parties' sometimes frustrating approach to the facts in this case, *see* Doc. 203 at 1 n.1, the material facts seem largely undisputed.[2] The spreadsheet was created by USA Dent and Expert Auto as representatives of BSM and Landmark. The spreadsheet reflects the <u>estimated</u> cost of repairing all the damaged vehicles on BSM's lot. BSM believes Landmark must pay the

---

[2]    Although BSM argues at times that there is a genuine issue of material fact in dispute, it also asks the Court to enter summary judgment in BSM's favor under Rule 56(f)(1). *See, e.g.*, Doc. 235 at 42. As noted, the Court previously denied BSM's motion for summary judgment.

spreadsheet amount, regardless of whether BSM repaired the vehicles at a lesser cost, and that Landmark has breached the insurance contract by not paying that amount. Landmark believes it is only obligated under the policy to pay the <u>actual</u> cost of repair. The actual cost of repairs is not known, and there is no documentation reflecting that amount. Landmark therefore asks the Court to find "as a matter of law" that the Policy does not require Landmark to pay the spreadsheet amount, and it has not breached the insurance contract.

Ultimately, therefore, this case turns on whether the policy requires Landmark to pay BSM the estimated cost of repair listed on the spreadsheet. Interpretation of an insurance policy is a question of law for a court to decide. *BancInsure, Inc. v. F.D.I.C.*, 796 F.3d 1226, 1233 (10th Cir. 2015). Courts should "consider the policy as a whole, rather than viewing provisions in isolation." *Id.* Where the language is unambiguous, a court should enforce the contract as made. *Id.* Likewise, unambiguous language should be "construed in its plain, ordinary, and popular sense and according to the sense and meaning of the terms used." *Graves v. Am. Family Mut. Ins. Co.*, 686 F. App'x 536, 538 (10th Cir. 2017) (internal quotation and citation omitted). "When an insurance contract is not ambiguous, the court may not make another contract for the parties." *Liggatt v. Emps. Mut. Cas. Co.*, 46 P.3d 1120, 1127 (Kan. 2002) (internal quotation and citation omitted). If a policy is ambiguous, it should be interpreted in favor of the insured. *BancInsure, Inc.*, 796 F.3d at 1233.

### 1.    The policy does not provide for payment based on the estimated cost of repair.

Landmark argues that BSM ultimately bears the burden in this case of proving that the insurance contract requires it to pay the estimated cost of repairs stated in the spreadsheet. Doc. 210 at 8-9. But Landmark points to the "PAYMENT OF LOSS" provision in Section IX.4. to argue there is no such requirement in the policy. *Id.* at 10. Section IX.4. states, in part:

> The Company at it's [sic] sole option may pay for the loss in money or may repair or replace the damaged or stolen unit or part thereof but if requested by the Company, the Insured shall replace such unit or part thereof or furnish the labor and materials necessary for repairs thereto and the Company shall pay only the actual cost to the insured.

Doc. 1-1 at 20. Landmark argues that BSM cannot meet its burden because nothing in this provision requires Landmark to pay the estimated cost of repair when actual repairs are made.

The Court has already found that nothing in this provision—nor any other in the policy—requires Landmark to pay BSM the estimated cost of repairs. *See* Doc. 203 at 10 (noting that BSM "has not pointed to any applicable policy language that demonstrates it is entitled to the spreadsheet total"). To the contrary, Section IX.4. specifically states that Landmark will pay only the "actual cost to the insured" when the insured "replace[s] such unit or part thereof or furnish[es] the labor and materials necessary for repairs thereto." Because it is undisputed that BSM hired USA Dent to repair some or all of the vehicles, BSM is only entitled to the actual cost of those repairs—evidence of which it does not have or has not provided.

BSM argues in response that the "PAYMENT OF LOSS" provision in Section IX.4. is a "minor provision dealing with a rare situation" and does not apply here. Doc. 235 at 39. It's unclear why BSM believes a policy provision dealing with payment of loss would be considered a "minor" or irrelevant provision, especially where the primary dispute in this case involves whether and in what amount an insurer must pay an insured for a loss. Regardless, the Court is not persuaded by BSM's arguments that Section IX.4. does not apply.

BSM's primary argument that Section IX.4. does not apply is one that the Court has already rejected—that Landmark never "requested" it to repair the vehicles, and that the "actual cost to the insured" provision was never invoked. *Id.* at 44, 48. As the Court previously found, Landmark "didn't 'request' that BSM replace or repair the vehicles because BSM advised Landmark in

writing that it repaired every vehicle." Doc. 203 at 10. Similarly unavailing is BSM's argument

that it was not required to repair the vehicles under the policy. Doc. 235 at 44, 50. To the extent

that is true, it is still undisputed that BSM <u>did</u> repair the vehicles, and the policy specifically

provides that where the insured "replace[s] such unit or part thereof or furnish[es] the labor and

materials necessary for repairs thereto," then the required payment under the policy is the "actual

cost to the insured." *See* Doc. 1-1 at 20.[3] And even if BSM is correct that "[t]he Court cannot infer

that [Section IX.4.] was invoked merely from the fact that BSM, on its own accord, decided to

repair some of the vehicles," Doc. 235 at 48, this still does not establish that BSM is entitled to

payment of the estimated cost of repair in the spreadsheet. In other words, even if Section IX.4.

did not apply, BSM would still have to show affirmative language in the policy that would justify

the relief it seeks.

Despite the fact that the Court has already found that BSM previously failed to identify

"any applicable policy language that demonstrates it is entitled to the spreadsheet total," Doc. 203

at 10, BSM argues that Landmark was required to pay the estimated cost of repairs listed in the

spreadsheet under Section X.A. Section X.A. is titled "Basis of Loss Settlement and Adjustment."

It states:

> In the event of a partial "loss" to any "automobile" insured
> hereunder which is not settled on an appearance damage basis, "We"
> will calculate settlement as follows:
>
> Labor rates will be calculated as ninety percent (90 %) of
> participating dealer's customary insurance labor rates. Parts, paint

---

3    BSM argues that the only option left to Landmark under Section IX.4. is to "pay for the loss in money." The Court
previously mentioned that neither party meaningfully addressed the significance of this clause. Doc. 203 at 10 n.4.
In its current motion, Landmark cites a case that suggests "pay[ing] for the loss in money" is simply an alternative
to electing "to replace or repair the damaged property or request[ing] that the insured do so." Doc. 210 at 9 n.2
(citing *Rawlins v. Esurance Prop. & Cas. Ins. Co.*, 2022 WL 225618 (E.D. Mo. 2022)). While this seems to be a
reasonable interpretation of this language, the Court ultimately need not reach that issue. As discussed throughout,
there is nothing in the policy that would require Landmark to pay the <u>estimated</u> cost of repairs, in money or
otherwise, especially where repairs are actually completed by the insured.

> and any other materials will be calculated at seventy-five percent
> (75[] %) of participating dealer's customary retail cost. If the
> participating dealer subcontracts all or part of the repairs to a repair
> facility in which they, their officers, shareholders or employees have
> no financial interest, "We" will make settlement at the cost to the
> participating dealer, subject to this rate being approved by "Us".

Doc. 1-1 at 21-22. BSM argues that Landmark was obligated to pay the spreadsheet amount under Section X.A. as either the "appearance damage basis" or via the calculation provision in the first two sentences of the second paragraph. Doc. 235 at 40.

Appearance Damage Basis. Relying on dictionary definitions for "appearance," "damage," and "basis," BSM argues that "Section X provides that when there is a partial loss to automobiles, the claim can be resolved (settled) using the methodology (basis) of the way the physical harm (damage) looks (appearance). That is precisely what happened here . . . ." *Id.* at 41. Putting aside whether this is a reasonable interpretation of "appearance damage basis,"[4] it seems clear that the parties have decidedly <u>not</u> settled this claim under this methodology. To the contrary, the primary dispute between the parties is whether there is any obligation under the policy to pay the spreadsheet amount. While an insurer certainly <u>could</u> agree to resolve the claim on an "appearance damage basis"—whatever that term means—that has not happened here, as the Court has already found. *See* Doc. 203 at 11 (noting that "there was no agreement that the amount in the spreadsheet would be paid"). But nothing in Section X.A. <u>requires</u> Landmark to pay anything, let alone the spreadsheet amount.

Calculation Provision. BSM alternatively argues that Landmark "promised to 'calculate settlement' with a 10% discount to labor rates and a 25% discount to parts, paint and any other materials," and that the spreadsheet reflects those discounts. Doc. 235 at 45. But even if it is correct

---

[4]   The policy does not define this term. The Court's research has uncovered no other cases construing this phrase.

that the spreadsheet reflect these discounts, it's still undisputed that Landmark has <u>not</u> settled this claim for this amount. Again, nothing here supports BSM's position that Landmark is obligated to settle the claim based on the estimated cost of repairs. BSM's argument also ignores the very next sentence in Section X.A., which—consistent with Section IX.4.[5]—states that settlement will be calculated "at the cost to the participating dealer" where the dealer "subcontracts all or part of the repairs to a repair facility in which they, their officers, shareholders or employees have no financial interest." *See BancInsure*, 796 F.3d at 1233 (noting that courts should "consider the policy as a whole, rather than viewing provisions in isolation"). Given that this seems to be what BSM did— have a third party make the repairs—it's unclear why the calculation provision would control over this sentence.[6]

In sum, BSM's breach of contract claim is premised on its belief that Landmark has breached the insurance contract by refusing to pay BSM the amount of the estimated cost of repairs. But BSM has not identified any contractual provision that would require Landmark to pay the estimated cost of repairs. Further, the policy unambiguously states that the payment of loss is based on the actual cost of the repairs when the insured repairs the vehicles or hires someone to repair the vehicles. And it is undisputed that BSM hired USA Dent to repair some or all of the vehicles but does not have or has not provided the actual cost of repairs in this case. Accordingly, there is no triable issue for a jury, and Landmark is entitled to summary judgment on BSM's

---

[5]   The Court disagrees with BSM that Section IX.4. somehow renders Section X.A. superfluous. *See* Doc. 235 at 54-55. Both provide that the cost of repair is the measure of damages where an insured repairs the vehicles. Section X.A. explains different methods of how that cost may be calculated depending on whether the repairs are done in house or by a third party.

[6]   BSM argues that it did not "subcontract" with a repair "facility" to make the repairs because there was no contract that its arrangement with USA Dent could be sub to, and because USA Dent allegedly performed the repairs on site and didn't have a separate "facility." Doc. 235 at 46-47. This argument is the type of "strained" or "tortured" interpretation BSM argues against. Regardless, as stated throughout, whether this provision applies or not, BSM has still not pointed to any language in the policy that entitles it to the estimated cost of repairs.

breach-of-contract claim. None of the additional arguments addressed below warrant a different outcome.

>   **2.     The Court cannot rely on course of performance or industry customs to read language into an insurance contract that is not there.**

BSM argues that Landmark settled a similar claim under the same policy for one of its affiliated dealerships in Wichita, and that the "industry custom and practice" is that "an insurance company's adjuster typically goes to the dealership, prepares a spreadsheet showing the loss and how much they propose to pay, and if the dealership (the insured) accepts that figure, the insurance company sends a check for that amount." Doc. 235 at 52-53. But neither of these facts, even if true, justify writing into the policy a provision that is not there—that Landmark owes BSM payment in the amount of the estimated cost of repair. The policy is not ambiguous on this point. It is silent. *See Liggatt*, 46 P.3d at 1127 (noting that a court cannot make another contract for the parties where there is no ambiguity).[7] The Court cannot impose a contractual obligation where there isn't one simply because Landmark has resolved other claims in different ways.[8]

>   **3.     The appraisal provision was not invoked.**

BSM alternatively argues that the Court should find that the parties "implicitly" invoked the appraisal provision of the policy, and that the spreadsheet should somehow control the measure of payment under that provision. Doc. 235 at 55. The Court has already rejected this argument, finding that it is undisputed that the appraisal provision was never invoked. Doc. 203 at 11-12.

---

[7]   To the extent an insured repairs damaged vehicles or hires another to repair them, the policy actually affirmatively provides for payment of the actual cost as opposed to the estimated cost of those repairs. This would make it even more improper to look beyond the policy to craft a different agreement.

[8]   BSM's argument about "actual cash value" has already been rejected. Doc. 203 at 9.

### 4.    Estoppel cannot expand coverage under the policy.

BSM argues that Landmark should be estopped from disputing the spreadsheet amount. Doc. 235 at 60-61. BSM argues that Landmark intended for it to believe that the spreadsheet amount was an appropriate valuation of the loss under the policy and that BSM was unaware that Landmark would later claim that coverage is based on the actual cost of repairs. *Id.* The Court disagrees for three reasons.

First, it is unclear why BSM would have been unaware that coverage was based on the actual cost of repair when that is what the policy says. "A party to a contract has a duty to read the contract before signing it, and the failure to read a contract does not make the contract less binding." *Liggatt*, 46 P.3d at 1125.

Second, as the Court has already found, and as the undisputed facts show, the parties never agreed to the significance of the spreadsheet total, which factually undermines BSM's estoppel argument. *See* Doc. 203 at 12.

Third, Landmark correctly notes that estoppel cannot be used to expand the coverage of an insurance policy, which is what BSM effectively seeks to do here. *See Unruh v. Prudential Prop. & Cas. Ins. Co.*, 43 F. Supp. 2d 1237, 1240 (D. Kan. 1999) ("It is well established that equitable estoppel may be invoked to forestall forfeiture of insurance coverage but it cannot be used to expand or create coverage."); *Coffeyville Res. Ref. & Mktg., LLC v. Liberty Surplus Ins. Corp.*, 2012 WL 2952359, at *2 (D. Kan. 2012) (noting that "waiver and estoppel cannot be used as affirmative claims to expand the coverage of an insurance policy" under Kansas law and that these doctrines "do not constitute a blank check to rewrite the insurance contract"); *cf. Hennes Erecting Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 813 F.2d 1074, 1078 (10th Cir. 1987) ("The difficulty is that waiver cannot be used to expand the coverage of an insurance contract; it applies

only to forestall the forfeiture of a contract."). BSM's estoppel argument effectively seeks to require Landmark to pay an amount that the policy does not require it to pay, which is not proper. *Coffeyville*, 2012 WL 2952359, at *3 ("Use of waiver or estoppel is considered an avoidance of a defense rather than an affirmative claim for relief."); *see also Lone Star Steakhouse & Saloon, Inc. v. Liberty Mut. Ins. Grp.*, 2003 WL 21659663, at *5 (D. Kan. 2003) ("After fully considering the briefs and arguments of the parties, the court concludes that waiver and estoppel [cannot] be used to support an affirmative claim for relief. This is consistent with the general rule that waiver and estoppel cannot be used to expand coverage of the policy.").[9]

### 5.    The Court does not reach Landmark's other arguments.

Landmark makes additional arguments in its motion, including that BSM did not satisfy condition precedents to receiving payment,[10] and that BSM cannot establish two additional elements of its breach-of-contract claim, including that BSM performed under the contract or sustained damages. *See Ice Corp.*, 444 F. Supp. 2d at 1169 (noting that a breach-of-contract claim requires a showing of, among other things, "the plaintiff's performance or willingness to perform

---

[9]    In addition to arguing that equitable estoppel applies, BSM also argues that promissory estoppel applies. Doc. 235 at 60-61. But BSM merely concludes that the "standards [of promissory estoppel] are satisfied here," without any meaningful analysis, and that Landmark should be promissorily estopped for the same reason it is equitably estopped. *Id.* at 61. This is insufficient to defeat summary judgment, and the argument fails for the same reasons stated above.

[10]    Landmark argues that BSM cannot enforce the contract because it failed to comply with the condition precedent to payment by providing the amount of loss it suffered in the form of the actual cost to repair. *See* Doc. 1-1 at 20 ("The loss shall not become payable unless, as a condition precedent to liability, there shall have been full compliance with all the terms and conditions of this policy . . . ."). BSM cites to another provision to argue that it was not required to comply with the terms and conditions of the policy because it filed suit within one year. *See id.* at 21 ("No suit may be commenced . . . unless the insured has first complied with all terms and conditions of this Policy unless such suit shall have been instituted within one year . . . ."). But this latter provision explains when a lawsuit can be filed, not when a loss becomes payable. The Court is dubious of BSM's interpretation of this provision, which seems to be that it may enforce contractual provisions against Landmark without complying with its own obligations as long as it files suit within one year. *See* Doc. 235 at 56. Regardless, it is undisputed that the actual cost of repair has not been provided.

in compliance with the contract" and damages). Because the Court finds Landmark has not breached any obligation under the policy, it does not reach these alternative arguments.

### B.    Breach of Good Faith and Fair Dealing

Landmark also moves for summary judgment on BSM's claim for breach of the covenant of good faith and fair dealing. Doc. 210 at 18-19. "Breach of the implied covenant of good faith and fair dealing is not a separate claim, but rather a legal argument related to a breach-of-contract claim." *Steven Volkswagen, Inc. v. Zurich Am. Ins. Co.*, 2020 WL 2615764, at *7 (D. Kan. 2020) (internal quotation and citation omitted). However, a court cannot rely on the covenant of good faith and fair dealing to create a contractual obligation where there is none. *Id.* Because the Court has found that BSM has not identified any contractual obligation Landmark has violated by not paying the estimated cost of repairs, the Court finds Landmark is entitled to summary judgment on this claim as well.[11]

### C.    Other Pending Motions

Because the Court finds that Landmark is entitled to summary judgment, the pending *Daubert* motions and motion to determine place of trial are denied as moot.

## IV.    CONCLUSION

The Court understands that might appear to be a harsh result, especially given that no one disputes that a storm caused significant damage to BSM's vehicles. And neither party leaves this case unblemished. BSM believes that Landmark is skirting an obligation, and Landmark believes that BSM is seeking an unwarranted seven-figure bonus. But the Court disagrees with BSM that this result is "absurd" or that it unfairly creates a windfall to Landmark. *See* Doc. 235 at 54. BSM

---

[11]   Because Landmark is entitled to summary judgment on both claims, BSM's claim for attorney fees is moot. *See* K.S.A. § 40-908 (addressing attorney fees when "judgment is rendered against any insurance company"); K.S.A. § 40-256 (same).

is still entitled to pursue a claim for the costs it incurred as a result of the storm, in accordance with the terms of the policy. But the Court cannot conclude that Landmark has breached an obligation it does not have.

THE COURT THEREFORE ORDERS that Landmark's Motion for Summary Judgment and Incorporated Supporting Memorandum of Law (Doc. 210) is GRANTED. The Clerk shall enter judgment in favor of Landmark on both claims.

IT IS FURTHER ORDERED that Landmark's Motions to Exclude (Docs. 211, 213, 215, and 216), BSM's Motion to Exclude (Doc. 214), and BSM's Motion to Designate Place of Trial (Doc. 217) are DENIED AS MOOT and WITHOUT PREJUDICE.

IT IS SO ORDERED.

Dated: September 1, 2022                     /s/ *Holly L. Teeter*
                                             HOLLY L. TEETER
                                             UNITED STATES DISTRICT JUDGE